2017 PA Super 101

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JOSEPH BERNARD FITZPATRICK, III, | |
| Appellee | No. 1498 MDA 2015 |

Appeal from the Order Entered September 1, 2015
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0002534-2014

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOSEPH BERNARD FITZPATRICK, III, | |
| Appellant | No. 1679 MDA 2015 |

Appeal from the Order Entered September 1, 2015
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0002534-2014

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, J., and STEVENS, P.J.E.[*]

OPINION BY SHOGAN, J.:                      **FILED APRIL 12, 2017**

The Commonwealth of Pennsylvania appeals from the order granting

the post-sentence motion for judgment of acquittal filed by Appellee, Joseph

_____

[*]  Former Justice specially assigned to the Superior Court.

Bernard Fitzpatrick, III.[1]  In addition, Appellee has filed a cross-appeal.  For the following reasons, we reverse and remand for reinstatement of the jury verdict and judgment of sentence, and we quash Appellee's cross-appeal.

The trial court summarized the factual and procedural history of this case as follows:

On June 6, 2012, emergency personnel were dispatched to 2288 Old Forge Road in Chanceford Township, which is located in York County, Pennsylvania.  EMTs found [Appellee] and his wife, Annemarie Fitzpatrick ["Victim"], down near the shore line of Muddy Creek.  [Victim] was unresponsive, but EMTs were eventually able to get a pulse and she was transported to the hospital.  A short time later, [Victim] was pronounced dead. Foul play was not suspected and the family began making arrangements; [Victim's] body was sent to the mortician for embalming.

Two days later, on June 8, 2012, the Pennsylvania State Police received a call from Rebekah Berry, who was employed by the same company as [Victim].  Employees at Collectibles Insurance had found a note in [Victim's] day planner that they felt was "suspicious."  The note said, "If something happens to me - JOE."  It was dated June 6, 2012, and signed "A. Fitzpatrick."  Upon request, Ms. Berry was given access to [Victim's] work email where she found an email from [Victim] to 'feltonfitz@gmail.com,' which was [Victim's] personal [email] account.  The subject line of the email stated, "if something happens to me," and the body of the email read 'Joe and I are having marital problems.  Last night we almost had an accident where a huge log fell on me.  Joe was on the pile with the log and had me untying a tarp directly below."  This email was sent

---

[1] We observe that appeals in criminal matters are ordinarily taken from the judgment of sentence.  However, our case law has permitted the Commonwealth to appeal from orders that grant post-sentence motions seeking judgment of acquittal in favor of a defendant. ***Commonwealth v. Feathers***, 660 A.2d 90, 94 (Pa. Super. 1995) (*en banc*).

June 6, 2012 at 10:30 A.M. Ms. Berry showed police the note and gave them access to [Victim's] email account.

After viewing the note and email, troopers contacted [Appellee] and asked if he would be willing to come in for an interview; [Appellee] agreed. [Appellee] was asked to again explain what occurred the night [Victim] died; he was never asked about the note or email.

On June 9, 2012, approximately two days after [Victim's] death and after the body had been embalmed, an autopsy was conducted. Dr. Barbara Bollinger, the forensic pathologist, determined that the cause of death was drowning. Although she was not asked to opine on the manner of death, she did state that she thought the circumstances were "suspicious."

From the point the handwritten note and email were found, the investigation turned from an accident investigation into a homicide investigation with the prime suspect being [Appellee]. Eventually, troopers discovered that [Appellee] was having a non-sexual affair with a woman named Jessica Georg, and was thinking of leaving his wife for her. When confronted, [Appellee] admitted to hiding [Victim's] phone from the police in an effort to hide this affair. Troopers also discovered that [Appellee] would gain approximately $1.7 million in life insurance if [Victim] were to die. After searching [Appellee's] work computer, troopers recovered two Google searches from around the time of [Victim's] death. The first search, done on June 1, 2012, searched for "life insurance review during contestability period." The second search, done on June 5, 2012, searched for "polygraph legal in which states." This all led to [Appellee's] arrest on March 6, 2014 - approximately a year and a half after [Victim's] death.

[Appellee] was formally arraigned on May 19, 2014, and Christopher A. Ferro, Esquire, entered his appearance on May 22, 2014. The case was assigned to the Honorable Gregory M. Snyder, who scheduled a pre-trial conference for August 18, 2014. After two extensions, [Appellee] filed an omnibus pre-trial motion on August 7, 2014. In that motion he raised several issues, however, because he only raises the issue of the hearsay note and email in his post-sentence motion we will not discuss the other issues. Specifically, [Appellee] argued that the handwritten note and email were inadmissible hearsay and the

Commonwealth should not be allowed to present either as evidence. The Commonwealth countered that the note and email were hearsay, but admissible under the state of mind exception. On October 20, 2014, Judge Snyder denied [Appellee's] request, and permitted the Commonwealth to present both the handwritten note and email.

The case was reassigned to the undersigned Judge due to Judge Snyder's reassignment into the Family Division.[2] We listed the case for trial during the May term of trials.

[Appellee's] trial began on May 4, 2015. On May 13, 2015, [Appellee] was found guilty of First Degree Murder, and was sentenced to life imprisonment on the same day. On May 22, 2015, [Appellee] filed a timely post-sentence motion. We directed each side to submit briefs in support of their respective positions by the close of business July 1, 2015. [Appellee] filed his brief on June 30, 2015, and the Commonwealth filed its brief July 2, 2015.

After reviewing the briefs, we scheduled oral argument on the sole issue of whether the Commonwealth presented sufficient evidence to prove beyond a reasonable doubt that [Appellee] unlawfully killed his wife. That argument took place on August 6, 2015. We reserved decision on all three issues.[3]

---

[2] The case was transferred to Judge Richard K. Renn, who presided over the jury trial and post-verdict proceedings.

[3] The three issues presented to the trial court were as follows:

I. Was the jury's verdict of guilty against the weight of the evidence, which would entitle the Defendant to a new trial?

II. Did the Commonwealth present sufficient evidence to prove each element of First Degree Murder beyond a reasonable doubt?

III. Did the original trial judge commit reversible error in permitting the Commonwealth to present a handwritten note and email penned by the victim?

*(Footnote Continued Next Page)*

- 4 -

Trial Court Opinion, 9/1/15, at 1-4.

On September 1, 2015, the trial court issued an order denying in part and granting in part Appellee's post-sentence motion. Specifically, the trial court denied Appellee's request for a new trial, but granted Appellee's motion for judgment of acquittal based on the Commonwealth's failure to present sufficient evidence to sustain a first-degree murder conviction. Order, 9/1/15, at 1. Also on September 1, 2015, the Commonwealth filed an appeal. On September 29, 2015, Appellee filed a cross-appeal from the September 1, 2015 order. The Commonwealth, Appellee, and the trial court have complied with Pa.R.A.P. 1925. On October 19, 2015, this Court *sua sponte* consolidated the appeals for disposition.

The Commonwealth presents the following issue for our review:

I. DID THE TRIAL COURT ERR IN GRANTING [APPELLEE'S] POST-SENTENCE MOTION FOR ACQUITTAL AS THE EVIDENCE WAS SUFFICIENT TO SUSTAIN A FIRST DEGREE MURDER CONVICTION?

Commonwealth's Brief at 5.

In addition, Appellee presents the following issues in his cross-appeal:

I. WHETHER THE TRIAL COURT, AFTER DETERMINING THE COMMONWEALTH FAILED TO PRESENT SUFFICIENT EVIDENCE TO PROVE EACH ELEMENT OF FIRST DEGREE MURDER BEYOND A REASONABLE DOUBT, PROPERLY GRANTED A JUDGEMENT [sic] OF ACQUITTAL?

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯

Trial Court Opinion, 9/1/15, at 4.

II. WHETHER [APPELLEE] WAS DENIED RIGHTS GRANTED TO HIM BY THE UNITED STATES CONSTITUTION AND PENNSYLVANIA CONSTITUTION WHEN INADMISSIBLE HEARSAY, IN THE FORM OF A NOTE AND EMAIL FROM [APPELLEE'S] DECEASED WIFE, WAS ADMITTED INTO EVIDENCE AND USED BY THE COMMONWEALTH TO SECURE A CONVICTION ON THE CHARGE OF MURDER?

Appellee/Cross-Appellant's Brief at 4.

In its sole issue on appeal, the Commonwealth argues that the trial court erred in granting Appellee's post-sentence motion for judgment of acquittal. Commonwealth's Brief at 30-81. In essence, the Commonwealth contends that it presented sufficient evidence at Appellee's trial to establish the necessary elements of first-degree murder beyond a reasonable doubt. We are constrained to agree.

Our standard of review is as follows:

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in

- 6 -

applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hutchinson*, 947 A.2d 800, 805-806 (Pa. Super. 2008)

(citations and quotation marks omitted).

Murder is defined, in relevant part, as follows:

**§ 2502. Murder**

**(a) Murder of the first degree.--**A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S. § 2502(a). The Pennsylvania Supreme Court has discussed the elements of first-degree murder as follows:

To convict a defendant of first degree murder, the Commonwealth must prove: [(1)] a human being was unlawfully killed; [(2)] the defendant was responsible for the killing; and [(3)] the defendant acted with malice and a specific intent to kill.

*Commonwealth v. Houser*, 18 A.3d 1128, 1133 (Pa. 2011) (internal citations omitted.)

A killing is intentional if it is done in a "willful, deliberate and premeditated fashion." 18 Pa.C.S. § 2502(d). The period of reflection needed to establish deliberation and premeditation may be as brief as a fraction of a second. *Commonwealth v. Rivera*, 983 A.2d 1211, 1220 (Pa. 2009). Indeed, the deliberation and premeditation needed to establish intent exist whenever the assailant possesses the conscious purpose to bring about death. *Id*. The Commonwealth may use circumstantial evidence to

- 7 -

establish the elements of first-degree murder, including the element of intent. *Id*.

Regarding the element of intent, our Supreme Court has long explained that "murder may be committed without a motive, either actual or apparent, but **an established motive may go to prove the related intent**[,] just as an absence of motive may be used to deny the existence of intent." *Commonwealth v. Jones*, 50 A.2d 317, 321 (Pa. 1947) (citations omitted) (emphasis added). In addition, we observe the following:

> When there is no direct evidence of intent to kill, the fact-finder may glean the necessary intent from the act itself and from all surrounding circumstances. **Specific intent to kill can be proven where the defendant knowingly applies deadly force to the person of another.** Death caused by strangulation is sufficient to infer the specific intent required for a conviction of first degree murder.

*Commonwealth v. Hawkins*, 701 A.2d 492, 500 (Pa. 1997) (citations omitted) (emphasis added). Furthermore, our Supreme Court has stated that "[t]he fabrication of false and contradictory accounts by an accused criminal, for the sake of diverting inquiry or casting off suspicion, is a circumstance always indicatory of guilt." *Commonwealth v. Homeyer*, 94 A.2d 743, 747 (Pa. 1953) (quoting *Commonwealth v. Spardute*, 122 A. 161, 163 (Pa. 1923)).

Our review of the record reflects that each of the three elements of first-degree murder was proven beyond a reasonable doubt. At trial, the Commonwealth presented the testimony of forensic pathologist, Dr. Barbara

K. Bollinger, who performed Victim's autopsy three days after the murder. N.T., 5/6/15, at 494-568. Dr. Bollinger opined that the manner of death was drowning. *Id*. at 497. Further, Dr. Bollinger testified to the multiple injuries appearing on Victim's body, which totaled at least twenty-five. *Id*. at 563. She stated that Victim had fourteen or more injuries about her torso, eight injuries to her upper extremities, and at least twelve injuries about her lower extremities. *Id*. at 562-563. Specifically, Dr. Bollinger documented the following injuries to Victim: bruises over the upper and lower lip; bruises over the right temporal region of the head and bruises to the upper right portion of the head; hemorrhages about the back of the head and about the mid aspects of the head;[4] hemorrhages on the right side of the neck within the muscles of the neck; three bruises to the scapular regions; a patterened bruise on the infrascapular region; several bruises to the right kidney region; abrasions on the left buttock; a bruise on the right buttock; a bruise between the breasts; a small bruise in the right lower abdominal quadrant; a bruise near the shoulder where the Victim's left arm and shoulder meet; a bruise along the left side of the torso that continued to the backside; bruises above the left hip area; a small scratch of the skin in the groin region; bruises on the back of the left thigh; a bruise on the outer aspect of the left foot; a bruise on the back of the right leg; scattered

_____

[4] Dr. Bollinger noted that "[t]here were no skull fractures and no collections of blood within the skull cavity." N.T., 5/6/15, at 500.

- 9 -

abrasions on the right leg and a severe laceration to the great toe; abrasions and contusions to the upper and lower parts of both of the arms; scratching and bruising about both of the elbows; scrapes and contusions on the back of both hands. *Id*. at 505-513.

In addition, Dr. Bollinger opined that, within a reasonable degree of medical certainty, the various bruises and injuries Victim suffered could have resulted from Victim being held under the water in a creek by another person and drowning. N.T., 5/6/15, at 558-564. Furthermore, repudiating Appellee's claim that Victim drowned in an ATV mishap involving both Appellee and Victim, Dr. Bollinger opined that "the lack of injuries to [Appellee] did not correspond with [Appellee's] rendition of the scene circumstances [regarding] what occurred at the time of [Victim's] drowning." *Id*. at 528.[5] Accordingly, this evidence was sufficient for the jury to

_____

[5] We note that during initial questioning in his home immediately after the incident, Appellee told Trooper Thomas Grothey of the Pennsylvania State Police a detailed story of an ATV accident in which Victim was driving the ATV, and Appellee was seated behind her. N.T., 5/5/15, at 227. Appellee told Trooper Grothey that the ATV accelerated very quickly backwards and went over the embankment that was approximately six feet higher than the creek level. *Id*. Appellee said that the last thing he remembered was Victim going over the top of Appellee's head when they hit the water. *Id*. at 228. Appellee claimed that he searched for Victim around the ATV, but could not find her. *Id*. at 228-229. Appellee told Trooper Grothey that when he eventually called 911 he saw Victim across the creek. *Id*. at 229. Appellee further indicated to Trooper Grothey that he jumped back into the water and retrieved Victim, but was not strong enough to carry Victim up the embankment. *Id*. Importantly, Appellee told Trooper Grothey that he was not hurt. *Id*. at 225. Trooper Grothey also testified that he "did not visibly
*(Footnote Continued Next Page)*

conclude beyond a reasonable doubt that Victim was unlawfully killed by being drowned in the creek. Thus, we conclude that the Commonwealth established the first element of the crime of first-degree murder.

With regard to the second element of first-degree murder, the evidence likewise established that the Commonwealth proved that Appellee was responsible for killing Victim. Indeed, it is undisputed that Appellee and Victim were alone on the property at the time that Victim drowned in the creek. Trooper Grothey testified that during the initial investigation, Appellee explained that he and Victim were celebrating their thirteenth wedding anniversary at the time of the incident and that their two children were staying with Appellee's parents. N.T., 5/5/15, at 225. Appellee has not disputed this fact. Thus, Appellee was the only person who could have held Victim underwater in the creek, thereby making him responsible for the killing.

Concerning the issue of specific intent possessed by Appellee, the Commonwealth presented ample evidence of the couple's estranged relationship, including the fact that Appellee was in the midst of an extra-

_(Footnote Continued)_ ───────────

see any injuries on [Appellee]." *Id*. Additionally, Corporal George Cronin of the Pennsylvania State Police testified at Appellee's trial regarding his interview with Appellee two days after the incident. N.T., 5/6/15, at 573-585. Corporal Cronin stated his observation was that Appellee had no injuries to his body. *Id*. at 577. Corporal Cronin also testified that Appellee indicated that he had no injuries, did not go to the hospital, and did not go to the doctor. *Id*.

marital relationship with another woman, Jessica Georg. N.T., 5/7/15-5/8/15, at 724–846. Appellee indicated to Ms. Georg that he was nervous about losing his house and his children in a separation or divorce. N.T., 5/8/15, at 772. In addition, Ms. Georg read into the record a Facebook post authored by Appellee to Ms. Georg two weeks prior to the murder, which provided, in relevant part, as follows:

> My children love their home and I would not want to take that from them. I know you are [a] package deal and have frankly thought about how I could change the girls['] rooms to accommodate your girls. But they are the easy things to get past. The hardest will be my separation.

*Id*. at 783. Also, on June 1, 2012, Appellee sent Ms. Georg an email which Ms. Georg described as follows, "[Appellee] wrote, I love you, in all caps with more exclamation points tha[n] I can count." *Id*. at 793.

On the evening of June 2, 2012, Appellee sent the following Facebook message to Ms. Georg:

> Can't believe how I've fallen in love with you in such a short period of time. It's crazy when you step back and think about it. I feel like I'm in a jail cell. Wanting something I can't have. So it hurts real bad. I believe you feel the same. I understand your position. Single, want to be with someone, have a man pursuing you that you have been intimate with, so you are torn and want satisfaction. Understanding this, I tried to push the limits, take risks at getting caught prematurely to develop what I truly believe will be something that few people on this earth get to experience. My life is riddled with so many emotions, it's hard to comprehend. I want to be yours. I want to help you pack, move, do whatever I can to help you, but I can't. It feels like something is sticking in my chest with a knife. I hate feeling this way. So tears are filling my eyes because I guess I have to say good-bye [sic] until things are appropriate.

N.T., 5/11/15, at 1085-1086.

Ms. Georg also testified that on the afternoon of the murder, Appellee sent Ms. Georg multiple text messages. N.T., 5/8/15, at 802-805. One of the text messages from Appellee stated, "[R]eally miss you." *Id*. at 803. The next text message from Appellee to Ms. Georg exclaimed, "And really really really really feel I was made for you." *Id*. Another text message from Appellee stated, "Yes. But it is true I love you." *Id*.

In addition, on that same afternoon Appellee sent Ms. Georg a text message with the lyrics of the song "You Are My Sunshine," and the comment, "Well, maybe one day you won't need to buy another property." N.T., 5/8/15, at 805. Appellee ended that particular text message with the statement, "Love you. XOOOOO." *Id*.

The Commonwealth also presented stipulated evidence of the existence of a total of $1,714,000 in life insurance policies upon Victim, with Appellee being the designated beneficiary of those policies. N.T., 5/11/15, at 920-921. In addition, it was stipulated that on the morning of June 1, 2012, Appellee conducted a Google search on his work computer using the words "life insurance review during contestability period." *Id*. at 918. This cumulative evidence, although circumstantial, viewed in the light most favorable to the Commonwealth, is sufficient to establish a motive for

Appellee's murder of Victim, thereby satisfying the necessary element of intent.[6]

In conclusion, the record, viewed in the light most favorable to the Commonwealth, reflects that the Commonwealth established Victim was unlawfully killed and that Appellee committed the murder with the requisite motive and intent. Accordingly, we reverse the order granting Appellee's motion for judgment of acquittal, and remand for reinstatement of the jury verdict on the charge of first-degree murder and judgment of sentence.

We next turn to the cross-appeal filed by Appellee, in which he challenges whether the Commonwealth met its burden of proof with regard to the crime of first-degree murder, and whether the trial court erred in denying his motion *in limine* to suppress two out-of-court statements of Victim. Appellee's Brief at 18-32, 32-47.

As our Supreme Court has noted:

_____

[6] We further observe that Appellee offered contradictory accounts of the details of the accident. Specifically, we note that Michael Simpson, the EMT who arrived on the scene, testified that Appellee told him that when Appellee did not see Victim after the accident "he got back in the water and dove down to the ATV." N.T., 5/6/15, at 424. Appellee stated to Mr. Simpson that he found Victim under the ATV and that "[i]t took him several tries to get her loose." *Id*. This account by Appellee contradicts the version of the incident he related to Trooper Grothey that, believing Victim might be trapped under the ATV, Appellee searched for Victim around the ATV and could not find her, and that it was not until he was later on the phone that Appellee saw Victim across the creek and then jumped back into the water and retrieved her from across the creek. N.T., 5/5/15, at 228-229. These contradictory accounts of the alleged accident given by Appellee immediately after the incident are additional indicators of guilt. **Homeyer**, 94 A.2d 747.

- 14 -

**only an aggrieved party can appeal from an order entered by the lower court**. Pa.R.A.P. 501; ***In re Elliott's Estate***, 388 Pa. 321, 131 A.2d 357, 358 (Pa. 1957); ***see also Green by Green v. SEPTA***, 380 Pa. Super. 268, 551 A.2d 578, 579 (Pa. Super. 1988) (citations omitted) ("To be 'aggrieved' a party must have been adversely affected by the decision from which the appeal is to be taken. Generally, a prevailing party is not 'aggrieved,' and, therefore, does not have standing to appeal an order which has been entered in his or her favor.")

***Commonwealth v. Polo***, 759 A.2d 372, 373 n.1 (Pa. 2000) (emphasis added).

In ***Commonwealth v. Dellisanti***, 831 A.2d 1159 (Pa. Super. 2003) (en banc), *reversed on other grounds*, 876 A.2d 366 (Pa. 2005), this Court quashed a cross-appeal from a judgment of sentence filed by the Commonwealth. In so doing, we stated the following:

We are constrained to quash the Commonwealth's appeal as there appears to be no basis upon which the Commonwealth may cross-appeal from the judgment of sentence. The Commonwealth is not an aggrieved party as it prevailed in the proceedings below. Appellant was convicted as the Commonwealth charged, and the Commonwealth took no issue with the legality or the discretionary aspects of the sentence imposed. Our research has revealed no cases in which the Commonwealth was permitted to cross-appeal from a judgment of sentence under the same or similar circumstances. It is axiomatic that a party who is aggrieved by an appealable order can appeal from that order if the issues have been properly preserved below. **The requirement that a prospective appellant be aggrieved by the order which he is attempting to appeal is not one which can be waived by the action or inaction of his opponents.** An aggrieved party is one who has been adversely affected by the decision from which the appeal is taken. **One is not an aggrieved party when one prevails and wins the case-in-chief even if one issue in the case was decided against that party.** Moreover, **a prevailing party's disagreement with the legal reasoning or basis for a decision does not amount to such**

- 15 -

**a cognizable aggrievement as is necessary to establish standing.**

*Id*. at 1163 n.7 (citations omitted) (emphases added). ***See also Taylor v. Department of Transportation***, 948 A.2d 189, 193 (Pa. Cmmw. 2008) (quashing without prejudice cross-appeal of Licensee who was not aggrieved because he prevailed below and was "presumably not dissatisfied with the trial court's ruling as said ruling was in his favor" and concluding that "Licensee apparently wants this Court to grant his appeal on the basis of every legal argument raised before the trial court").[7]

Our review of the record reflects that on May 13, 2015, the jury returned a verdict of guilty on the sole charge of first-degree murder. That same day the trial court imposed a judgment of sentence of life imprisonment. Appellee then filed timely post-sentence motions. On September 1, 2015, the trial court entered an order that denied Appellee's request for a new trial but granted "[Appellee's] motion for acquittal based on the Commonwealth's failure to present sufficient evidence to sustain a First Degree Murder conviction." Order, 9/1/15, at 1. Immediately, the

---

[7] "Although decisions of the Commonwealth Court are not binding on this Court, we may rely on them if we are persuaded by their reasoning." ***NASDAQ OMX PHLX, Inc. v. PennMont Secs.***, 52 A.3d 296, 308 n.7 (Pa. Super. 2012); ***see also Commonwealth v. Rodriguez***, 81 A.3d 103, 107 n.7 (Pa. Super. 2013) ("Although the decisions of the Commonwealth Court are not binding upon this Court, they may serve as persuasive authority").

Commonwealth filed an appeal from the trial court's order.[8]   Appellee then filed a cross-appeal from the trial court's order of September 1, 2015. However, in light of the trial court's ruling granting Appellee's motion for judgment of acquittal, Appellee is presumably not dissatisfied with the trial court's ruling on his post-sentence motion.  Indeed, it cannot be said that Appellee was aggrieved by the order on appeal because said order granted his request for judgment of acquittal.  Moreover, Appellee has presented his argument setting forth why he believes that the trial court was correct in granting his post-sentence motion.  Appellee's Brief at 18-32.

Accordingly, even though the trial court did not grant Appellee's request for a new trial, we fail to see how Appellee was aggrieved by the order granting his request for judgment of acquittal so as to endow him with standing to file the instant cross-appeal.  Hence, we quash Appellee's cross-appeal because he prevailed below.  *Dellisanti*, 831 A.2d at 1163 n.7. However, we do so without prejudice to Appellee's ability to file a direct appeal from the reinstated judgment of sentence, at which point Appellee may raise any and all appropriate and preserved issues that he deems to be necessary.

---

[8] As previously noted, our case law has permitted the Commonwealth to appeal from orders that grant post-sentence motions for judgment of acquittal in favor of a defendant.  *Feathers*, 660 A.2d at 94.  However, our research has discovered no cases wherein a successful defendant who has been granted a judgment of acquittal of the only crime charged against him has taken an appeal from that order.

In conclusion, we reverse the trial court's order granting Appellee's post-sentence motion for judgment of acquittal. We quash Appellee's cross-appeal from the order disposing of Appellee's post-sentence motions. Further, we remand this matter to the trial court with direction to reinstate the jury's guilty verdict and original judgment of sentence. **Feathers**, 660 A.2d at 94.

Order reversed. Case remanded for reinstatement of the jury verdict and judgment of sentence. Cross-appeal at 1679 MDA 2015 quashed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/12/2017