J-A21025-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| KEITH OMAR HORTON, | |
| Appellant | No. 1368 WDA 2016 |

Appeal from the Judgment of Sentence July 22, 2016
In the Court of Common Pleas of Erie County
Criminal Division at No(s): CP-25-CR-0000818-2015

BEFORE:  BENDER, P.J.E., OLSON, J., and STABILE, J.

MEMORANDUM BY OLSON, J.:                    **FILED NOVEMBER 07, 2017**

Appellant, Keith Omar Horton, appeals from the judgment of sentence entered on July 22, 2016, following his jury convictions for voluntary manslaughter, possessing an instrument of crime (PIC), recklessly endangering another person (REAP), and aggravated assault.[1]  We affirm.

The trial court summarized the facts of this case as follows:

In the early morning hours of November 22, 2014, [Appellant] attended a birthday party for a friend at the Red Tomato Lounge on the corner of 18th and Peach Streets in the City of Erie.  Also present at the party were Shadarea Flemings and Derrick Hemphill, who arrived at 1:00 a.m.  Their friends, Seante and Damon arrived shortly after.

---

[1] 18 Pa.C.S.A. §§ 2503, 907, 2705, and 2702, respectively.

After passing through security, all walked to the back of the club where Flemings and Seante took pictures in a photo booth.

At some point, Flemings and Seante left the Red Tomato to retrieve cigarettes from Flemings's car, which was parked in the Firestone parking lot across the street from the Red Tomato. While in the parking lot, Flemings noticed Arbie Wilson, an old friend, sitting in another car a few spaces over. Wilson approached Flemings and the two talked briefly. Wilson did not accompany Flemings and her friend back into the party, but instead, sat in Flemings's car. Flemings testified that she thought Wilson asked to stay in her car because people knew what kind of car he was in before, and her car had tinted windows, so no one would be able to see him.

When Flemings reentered the Red Tomato, security did not search her. A man standing next to the door[, whom] Flemings identified as [Appellant], alerted security they did not search Flemings and her friend when they re-entered the party. Security asked Flemings to return to the door to submit to a search. Flemings, though compliant, got "mad as f[**]k" and called [Appellant] a "bitch ass n[**]ger." At that point, [Appellant] began arguing with Flemings. The people around them started pushing them apart, in an attempt to break up the verbal altercation. During the dispute, Jameele Williams, joined in and told Flemings he was going to "beat her ass and make her go get her n[**]ger." Flemings explained this meant Williams was going to beat her up so badly she needed to get Hemphill for protection. Flemings and company pushed past the crowd and continued to the back of the party where Hemphill was waiting. Neither [Appellant] nor Williams followed Flemings further into the party.

When Flemings found Hemphill, she told him about her dispute with [Appellant]. She also told Hemphill that she had a bad feeling about what happened at the entrance to the club and that they should leave. Hemphill agreed, and the couple left the party through the front door which led to 18th Street. As the two left, Flemings continued to yell insults at the people in the VIP section of the party, but no one else approached them.

When Flemings and Hemphill reached the middle of 18th Street, she heard [Appellant] coming around the corner of the Red Tomato building shouting, "Here I come. Right here. Here I go.

- 2 -

Right here." Flemings testified that Jameele Williams quickly followed [Appellant] and came up the middle of the street, near her and Hemphill. Hemphill turned around to face [Appellant] and asked him if he wanted to fight. [Appellant] said "yes." Williams rushed over to where [Appellant], Flemings, and Hemphill were standing. Both Williams and Hemphill pulled up their pants and started to "square off" as if to prepare for a fight. At some point, Flemings realized Williams was digging in his pants pocket for a gun and screamed for Hemphill to run. Hemphill took off running down 18th Street in the direction of Peach Street with Jameele Williams chasing him and firing his weapon.

When the gunfire from Williams subsided, Flemings testified she saw Wilson near her car and heard [Appellant] yell, "Now, bitch ass n[**]ger, your gun jammed" to Wilson. Flemings ran to her car and hid under the dashboard. When she looked up, she saw [Appellant] standing in front of her car pointing his gun at her. [Appellant] then ran towards State Street. Flemings heard more gun shots and eventually saw Wilson running across the street, limping. [Appellant] and Williams were also in view. Flemings stated she only saw [Appellant] and Williams with guns that night.

Flemings eventually left her vehicle in the Firestone parking lot and found a ride home with strangers. She called 911 but hung up before she spoke with someone. About forty-five minutes later, members of the Erie Police Department arrived at Fleming's home to ask her questions. At first, she did not tell the officers everything she knew and gave officers conflicting stories. She did not learn that Wilson was dead until 4:00 a.m. when police came back a second time and took her to the police department to speak with detectives.

Before this, however, officers from the Erie City Police Department were dispatched to the area of 18th Street between Peach and State Streets for a call of shots fired. Upon arrival, Officer Justin Stidham found a crowd gathering around a young, black, male lying on his back, with an apparent gunshot wound to his chest. The man was alive, but unconscious, and barely breathing. [Officer] Stidham first attempted to get the crowd to disperse and then began rendering emergency aid to the victim until EMS services arrived to take the victim to the hospital. [Police recovered forensic evidence from the scene and video

footage of the incident from the Labor Temple building nearby.] The victim was later identified as Arbie Wilson. After unsuccessful surgical intervention, Wilson died.

Trial Court Opinion, 10/19/2016, at 3-5 (original brackets and record citations omitted).

Procedurally, the case progressed as follows:

[Appellant] was originally charged with the criminal homicide of Arbie Wilson, conspiracy to commit criminal homicide, one count of aggravated assault on Arbie Wilson, [PIC], criminal attempt at criminal homicide as to Derrick Hemphill, an additional count of aggravated assault as to Derrick Hemphill, [REAP] as to Derrick Hemphill, simple assault as to Shadarea Flemings, and terroristic threats as to Shadarea Flemings.

Following a pre-trial motion hearing, the conspiracy charge was dismissed. No appeal was taken by the Commonwealth.

Trial began on August 31, 2015. At the conclusion of the Commonwealth's case-in-chief, [Appellant's] motion for judgment of acquittal for the charge of criminal attempt to commit criminal homicide was granted.

A jury then found [Appellant] not guilty of first and third degree murder, the aggravated assault of Derrick Hemphill, and the charges of simple assault and terroristic threats to Shadarea Flemings. The jury found [Appellant] guilty of [REAP] as to Derrick Hemphill, but was unable to reach a verdict on the other charges. A mistrial on those charges was declared.

The Commonwealth retried [Appellant] on the deadlocked counts[, which included voluntary manslaughter/criminal homicide of Wilson, aggravated assault of Wilson, and PIC.] In the interim, [Appellant's] co-defendant, Jameele Williams, who had also been partially convicted, filed a motion to sever [his] remaining charges from [Appellant's remaining charges]. The motion was granted.

[Appellant's] second trial began May 23, 2016. Prior to giving final instructions to the jury, [Appellant] objected to the trial court's instruction on accomplice liability. [Appellant's] objection

- 4 -

was overruled. At the end of the second trial, [Appellant] was convicted by jury on all remaining charges.

On July 22, 2016, [Appellant] was sentenced to an aggregate of one-hundred two to two-hundred four months['] (eight years, six months to seventeen years[']) incarceration.

*Id.* at 1-2 (footnote omitted). This timely appeal resulted.[2]

On appeal, Appellant presents the following issues for our review:

1. Did the Commonwealth present insufficient evidence at the first trial to sustain the conviction of [REAP] under a theory of direct or accomplice liability?

2. Did the Commonwealth present insufficient evidence at the second trial to sustain Appellant's convictions for voluntary manslaughter, aggravated assault, and/or [PIC] under a theory of direct or accomplice liability?

3. Did the trial court commit an abuse of discretion or error of law when it denied Appellant's motion for a new trial on the basis that the convictions at the second trial were contrary to the weight of the evidence?

4. Did the trial court err when it instructed the jury, over defense counsel's objection, that an individual may be convicted of voluntary manslaughter under a theory of accomplice liability?

5. Did the trial court err when it instructed the jury on accomplice liability, at the second trial, where the facts of record did not demonstrate that Appellant intended to

_____

[2] Following trial, the trial court granted Appellant an extension to file a post-sentence motion. Thereafter, Appellant filed a timely post-sentence motion. By order entered on August 15, 2016, the trial court denied relief. On September 13, 2015, Appellant filed a notice of appeal. On the same day, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied timely. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on October 19, 2016.

facilitate the shooting death of Mr. Wilson and/or aided or encouraged anyone in that regard?

Appellant's Brief at 8 (complete capitalization and suggested answers omitted).

Appellant's first two issues challenge the sufficiency of the evidence to support his various convictions. The standard we apply is as follows:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Fitzpatrick*, 159 A.3d 562, 567 (Pa. Super. 2017) (citation omitted).

In his first issue presented, Appellant claims that the Commonwealth failed to present sufficient evidence to support his conviction for REAP as the principal actor, or under a theory of accomplice liability, with regard to the victim, Derrick Hemphill. *Id.* at 37-41. Appellant claims that although he initially challenged Hemphill to a fight, co-defendant, Jameele Williams,

"came onto the scene and directly engaged with Hemphill" and "[w]hen Williams started chasing and shooting at Hemphill, Appellant just stood there." *Id.* at 40. Moreover, Appellant claims there was no evidence that Appellant "knew Williams had a loaded firearm." *Id.* at 41 (citation omitted).

"A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S.A. § 2705. "The *mens rea* required for this crime is a conscious disregard of a known risk of death or great bodily harm to another person." *Commonwealth v. Martir*, 712 A.2d 327, 328 (Pa. Super. 1998).

"A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both." 18 Pa.C.S.A. § 306(a). "A person is an accomplice of another person in the commission of an offense if […] with the intent of promoting or facilitating the commission of the offense, he: (i) solicits such other person to commit it; or (ii) aids or agrees or attempts to aid such other person in planning or committing it[.]" 18 Pa.C.S.A. § 306(c)(1). Moreover, "[a]n accomplice may be convicted on proof of the commission of the offense and of his complicity therein, though the person claimed to have committed the offense has not been prosecuted or convicted or has been convicted of a different offense or degree of offense or has an immunity to prosecution or conviction or has been acquitted." 18 Pa.C.S.A. § 306(g).

Here, the trial court determined:

The evidence presented at trial showed that after an altercation with Flemings, [Appellant] and Mr. Williams raced after Flemings and Hemphill in the middle of 18th Street. Flemings testified that she heard Hemphill ask [Appellant] if he wanted to fight; [Appellant] responded in the affirmative. After this, Flemings believe[d] Williams attempt[ed] to retrieve a firearm from his pocket.

Video footage recovered from the night of the incident also showed [Appellant] and Williams returning to [Appellant's] car to retrieve what appeared to be firearms. Williams, Hemphill, and [Appellant] are later seen running while shots [were] fired. Evidence was also presented to indicate that as of the day of trial, [Appellant] still owned a .40 caliber firearm, which was the type of firearm that would have discharged many of the projectiles found at the scene.

This evidence is sufficient to support [Appellant's] conviction for [REAP]. [Appellant] was present at the time threats were made to Hemphill; [Appellant] and Williams returned to [Appellant's] car to retrieve what appeared to be firearms; [Appellant] was initially with his co-defendant who chased Hemphill. Once Williams did so, there exists evidence supporting the fact that [Appellant] fired shots in the area. Coupled with Flemings' testimony, the evidence, when seen in the light most favorable to the Commonwealth, proves the elements of [REAP], either directly or on an accomplice liability basis.

Trial Court Opinion, 10/19/2016, at 16 (record citation omitted).

Based upon our standard of review and our examination of the certified record, we discern no error in denying Appellant relief on his first sufficiency claim. Here, Appellant engaged in verbal confrontations with Fleming and Hemphill. Appellant and Williams retrieved firearms from Appellant's vehicle and began running towards Hemphill. An eyewitness testified that Appellant was wielding a firearm and video surveillance footage

confirmed it. There was evidence that Appellant owned a firearm at the time of the crimes. Multiple shots were fired at Hemphill. Appellant and Williams were seen fleeing the scene together in Appellant's car. Forensic evidence confirmed Appellant's firearm was the same caliber as bullet fragments police recovered from the scene. There was sufficient circumstantial evidence to support a conviction for REAP with Appellant as the principal actor. Moreover, even if Appellant was not the actual shooter, the evidence showed that Appellant aided Williams in the commission of REAP, when the two men retrieved firearms from Appellant's vehicle, ran towards Hemphill in concert with one another, recklessly placed Hemphill in danger of death or serious bodily injury by firing shots in the victim's direction, and then fled the scene together in Appellant's vehicle. Hence, Appellant's first issue lacks merit.

Next, Appellant claims there was insufficient evidence to support his convictions for voluntary manslaughter, aggravated assault, and PIC, with regard to the victim, Arbie Wilson. Appellant's Brief at 42-45. Appellant argues that Fleming was not able to identify him and did not see him fire an actual weapon and that Appellant's physical location *vis-a-vis* Wilson at the time he sustained the fatal gunshot wound precluded him from being the shooter. *Id.* at 43-44. Appellant maintains that, "the testimony of record does not indicate that Appellant had any negative interaction with Wilson earlier in the evening" and the videotaped surveillance "present[ed] two other possible shooting suspects" who "had the correct angle by which to

inflict the fatal wound." *Id.* Accordingly, Appellant posits that "[t]here is no evidence that Appellant intended to promote the killing of Wilson or agreed to aid or assist William in committing the murder." *Id.* at 45.

On this issue, the trial court decided there was sufficient evidence to support Appellant's convictions for voluntary manslaughter, aggravated assault, and PIC:

> […] Shadarea Flemings, an eyewitness to the shooting, confirmed the identity of [Appellant] on the video recovered from the Labor Temple where he was seen running to his car with Jameele Williams [and] retrieving what appeared to be a firearm. Later, [Appellant] is seen on the video following Wilson after Wilson appears on screen, limping across the street. Next, [Appellant] and Williams are seen running back to [Appellant's] car and driving away. Flemings also testified she heard [Appellant] yelling to Wilson about a gun jamming or misfiring, placing [Appellant] squarely in the middle of a conflict involving firearms with the victim.
>
> Additional testimony revealed numerous bullet jackets, fragments, and other physical evidence [recovered from] the Firestone parking lot, the area in which Flemings stated she saw [Appellant] and Wilson together.
>
> Finally, the medical evidence showed Wilson was shot from the back to the front on the left side on his body. [Appellant], as shown on his booking sheet, [is] left[-]handed, making it possible he fired the fatal shot, even if he appeared to the right of Wilson in the video [surveillance]. Direct evidence of [Appellant's] involvement notwithstanding, evidence was presented to also show his liability as an accomplice. In all video footage, [Appellant] was seen with Jameele Williams, who also retrieved what appeared to be a firearm from the same car, running through the streets of downtown Erie.

Trial Court Opinion, 10/19/2016, at 19.

Upon review, we discern no error or abuse of discretion in the trial court's conclusion that there was sufficient evidence to support Appellant's convictions for voluntary manslaughter, aggravated assault, and PIC. Initially, we reject Appellant's suggestion that there was insufficient evidence to identify him as the perpetrator. We have previously determined that "evidence of identification need not be positive and certain to sustain a conviction." *Commonwealth v. Jones*, 954 A.2d 1194, 1197 (Pa. Super. 2008) (citation omitted). Moreover, "[i]t is settled law that a witness may testify to a person's identity from his voice alone" and "the weight to be accorded voice identification testimony is a question for the trier of fact." *Id.* (original citation, quotations, and brackets omitted). Here, an eyewitness saw Appellant wield a firearm, heard Appellant say to the victim, "Now, bitch ass n[**]ger, your gun jammed," and then heard gunshots which resulted in the Wilson's death. Furthermore, there was evidence that Wilson was shot by a left-handed assailant and there was evidence that Appellant is, in fact, left-handed. Based on this evidence, we find there was sufficient identification evidence.

We turn now to examine the elements of the individual offenses to determine whether there was sufficient evidentiary support to uphold Appellant's convictions. First, "[a] person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by [] the individual killed." 18 Pa.C.S.A. § 2503(a)(1). Next,

"[a] person is guilty of aggravated assault if he [] attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S.A. § 2702(a)(1). "A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. § 907(a).

Here, there was evidence that Appellant and Wilson engaged in a verbal confrontation, Appellant was seen wielding a firearm, and was heard yelling at Wilson. We conclude there was sufficient evidence to support a conviction for voluntary manslaughter. Appellant killed Wilson without lawful justification while acting under sudden passion caused by Wilson's provocative conduct. Moreover, we have upheld convictions for voluntary manslaughter under a theory of accomplice liability. *See Commonwealth v. Kimbrough*, 872 A.2d 1244, 1255 (Pa. Super. 2005). As set forth above, the evidence showed that Appellant and his co-defendant aided each other by retrieving firearms from Appellant's vehicle, running towards the victim while gunshots rang out, and then eventually fled together in Appellant's vehicle. Thus, there was also sufficient evidence that Appellant was an accomplice to his co-defendant. Likewise, we find there was sufficient evidence to support Appellant's conviction for aggravated assault. Appellant recklessly fired a weapon at the victim. When shots were heard, an eyewitness saw Appellant holding a firearm that matched bullet fragments and casings recovered from the scene. This was also sufficient evidence to

support Appellant's conviction for PIC. For all of the foregoing reasons, we conclude there was sufficient evidence to support Appellant's convictions for voluntary manslaughter, aggravated assault and PIC.

Appellant, in the alternative, maintains that his convictions for voluntary manslaughter, aggravated assault and PIC were against the weight of the evidence. Appellant's Brief at 45-49.

Our standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Orie*, 88 A.3d 983, 1015 (Pa. Super. 2014) (citation omitted).

Here, the trial court determined that the convictions for voluntary manslaughter, aggravated assault and PIC did not shock the conscious of the court and Appellant was not entitled to relief on his weight of the evidence. Based upon our deferential standard of review and an examination of the certified record, we discern no abuse of discretion in rejecting Appellant's weight claim.

- 13 -

Appellant's final two arguments pertain to jury instructions on accomplice liability and we will examine them together. In his fourth issue presented, "Appellant suggests that the jury should have been instructed that Appellant could not be convicted of voluntary manslaughter on the basis of accomplice liability." Appellant's Brief at 50. However, as previously mentioned, we have upheld convictions for voluntary manslaughter under a theory of accomplice liability. *See Kimbrough*, 872 A.2d at 1255. Thus, we summarily reject this claim. Next, Appellant contends the evidence of record did not support an instruction on accomplice liability. Appellant's Brief at 50-51.

Our Supreme Court has set forth the standard used when adjudicating whether a trial court had grounds for instructing the jury on a certain matter:

> It is axiomatic that a jury need not be instructed regarding matters that have no relevance to the evidence introduced at trial.
>
>         *           *           *
>
> There is no duty on a trial judge to charge a jury upon a law which has no applicability to the presented facts. There must be some relationship between the law upon which an instruction is required and the evidence presented at trial.

*Commonwealth v. Meadows*, 553 A.2d 1006, 1013 (Pa. Super. 1989) (citations omitted).

We employ the following standard in assessing jury instructions:

> When evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

***Commonwealth v. Sauers***, 159 A.3d 1, 12 (Pa. Super. 2017) (citation and brackets omitted).

In this matter, as set forth at length ***supra***, the evidence showed that Appellant and his co-defendant aided each other by retrieving firearms from Appellant's vehicle, running towards the victims while gunshots rang out, and then eventually fled together in Appellant's vehicle. Thus, there was a strong relationship between the law of accomplice liability and the evidence presented at trial to warrant an instruction. Hence, Appellant's final two claims lack merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/7/2017

- 15 -