**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 6 MAP 2020 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court dated February 19, |
| | : | 2019, Reconsideration Denied April |
| v. | : | 23, 2019, at No. 259 MDA 2018, |
| | : | Affirming the Judgment of Sentence |
| | : | dated December 6, 2017 at No. CP- |
| JOSEPH BERNARD FITZPATRICK, III, | : | 67-CR-2534-2014. |
| | : | |
| Appellant | : | ARGUED:  September 15, 2020 |

**OPINION**

**JUSTICE WECHT**                                                          **DECIDED: July 23, 2021**

Because hearsay is presumptively unreliable and unworthy of belief, it generally is barred from admission in courts of law.[1]  But not every extra-judicial statement that later is repeated inside of a courtroom constitutes inadmissible hearsay.  In light of the varied exceptions to the rule against hearsay that have developed in the law of evidence, a trial court's task is often far from simple.  Things can get complicated pretty quickly.

To constitute hearsay, a statement first must be uttered out-of-court, and then it must be offered in court for the truth of the matter asserted in the statement.  For example, consider a witness at a murder scene who tells a police officer that "the killer had green eyes." If the prosecution offered that statement at a subsequent murder trial to prove that the murderer's eyes, in fact, were green, it would be hearsay.[2]  However, if the statement

---

[1]     *See generally* Pa.R.E. 802.

[2]     *See* Pa.R.E. 801(c)(1)-(2).

is intended to be used for some purpose other than establishing its truth—*i.e.*, to show the effect that the statement had on the listener (say, for instance, the utterance caused the police officer to create a photo array using only people with green eyes)—then it would not be hearsay and, consequently, would be admissible for that non-truth purpose, subject to any other applicable evidentiary rules.  At times, the line that divides hearsay from non-hearsay can be difficult to discern.

The task of identifying a statement as hearsay by scrutinizing the purpose for which it is being offered is only the first step.  Facially inadmissible hearsay still may be introduced as substantive evidence for the truth of the matter asserted if the statement falls under one of numerous exceptions to the general hearsay proscription.  These exceptions arise from various circumstances that "enhance the reliability of the contents of the utterance,"[3] and range from business records and ancient texts to statements against interest and dying declarations.  *See generally* Pa.R.E. 803, 804.  The applicability of some of the exceptions depends upon the availability (or unavailability) of the speaker, *id.* 803, 804, while others depend upon whether the declarant is subject to cross-examination.  *See id.* 803.1.  When a party invokes one of these exceptions, a court must ascertain whether the proffered statement meets the exacting demands of the exception.  This is not always an easy chore.

The case before us today is a good example of the difficulties posed by hearsay and its exceptions.  Here, we consider the applicability of the "then-existing mental, emotional, or physical condition" exception,[4] which has come to be known as the "state of mind" exception.  The victim in this murder case, Annemarie Fitzpatrick (hereinafter "Annemarie") wrote a note in her day planner on the day before she died.  The note read:

---

[3]     *Commonwealth v. Chamberlain*, 731 A.2d 593, 595 (Pa. 1999) (citation omitted).

[4]     Pa.R.E. 803(3) (capitalization modified).

"If something happens to me—JOE," an apparent reference to her husband, Joseph Fitzpatrick, III (hereinafter "Fitzpatrick"). Both the trial court and the Superior Court held that Annemarie's statement was admissible as an expression of her then-existing state of mind under Rule 803(3). We conclude that the statement was admitted in error, and that the error was not harmless. Hence, we reverse, and we remand for a new trial.

On June 6, 2012, Fitzpatrick and Annemarie were riding on an all-terrain vehicle ("ATV") through a deep part of Muddy Creek, a tributary of the Susquehanna River that runs near their home in Chanceford Township, York County, Pennsylvania. According to Fitzpatrick, at some point during their trek, the vehicle flipped backwards and tossed both riders into the creek. Although Fitzpatrick managed to climb out of the water relatively unscathed, in his version of events, Annemarie could not. Fitzpatrick claimed that he called 911 after he initially was unable to locate Annemarie in the water. While on the line with a dispatcher, Fitzpatrick allegedly saw Annemarie's body floating nearby on the side of the creek opposite from where he was standing.

Pennsylvania State Police ("PSP") troopers and emergency medical technicians ("EMT") responded to the scene. Fitzpatrick—who presented no obvious signs of injury and refused medical treatment—told a PSP trooper that, when he located Annemarie, he dove into the creek, removed her body from the water, and began to perform CPR. The EMTs took over the resuscitation efforts. Once the EMTs were able to restart Annemarie's pulse, they immediately transported her to the local hospital. A short time later, Annemarie died. The York County Coroner's Office determined that the cause of Annemarie's death was drowning. Upon further determining that an autopsy was not necessary at that time, the Coroner's Office released Annemarie's body to a mortician, who embalmed her remains.

At first, the PSP investigators uncovered no evidence of foul play. By all initial accounts, it appeared to the authorities that Annemarie had died in an ATV accident on June 6. Two days later, things changed dramatically. On June 8, 2012, the PSP received a telephone call from Rebekah Berry, one of Annemarie's co-workers at Collectibles Insurance Services, a business that is located across the state line in Hunt Valley, Maryland. This call transformed the case into a murder investigation, with Fitzgerald being the lead suspect.

Berry told PSP investigators that her co-workers had found a day planner on Annemarie's desk. Annemarie had left a note in the day planner that read, "06/05/12. If something happens to me—JOE." Annemarie had personally signed the note. After reviewing the note, PSP personnel obtained access to Annemarie's password-protected work email account. The troopers discovered that, at 10:30 a.m. on June 6, 2012, the day she died, Annemarie sent an email from her work email account to her personal email account, "feltonfitz@gmail.com." In the subject line of the email, Annemarie wrote, "if something happens to me." In the body of the message, Annemarie stated, "Joe and I are having marital problems. Last night we almost had an accident where a huge log fell on me. Joe was on the pile with the log and had me untying a tarp directly below."

That same day, PSP investigators interviewed Fitzpatrick at a PSP barracks. Fitzpatrick related that he and Annemarie went to Muddy Creek to have a waterside picnic in celebration of their wedding anniversary. During dinner, Fitzpatrick drank three beers. Annemarie had a glass of wine. After they ate, Fitzpatrick and Annemarie wanted to start a campfire, but they had left the propane torch needed to ignite the fire back at their house. They climbed onto the ATV, with Annemarie in the driver's position and Fitzpatrick the passenger. Annemarie, who, according to Fitzpatrick, was inexperienced in driving ATVs, started toward the house to get the torch, with Fitzpatrick behind her.

Fitzpatrick told the PSP that, due to his wife's limited ability operating ATVs, he had to reach around Annemarie to assist her with the controls. He explained that he reached around her left side to shift gears and around her right side to throttle the vehicle. Fitzpatrick claimed that, when he twisted the throttle, the ATV shot forward and flipped them both backwards into the water.

As the interview progressed, however, Fitzpatrick's version of the events began to change. For instance, he retracted his statement that he had shifted the gears and twisted the throttle. He proceeded now to state that he believed that it had to be Annemarie who did so, because he no longer could remember reaching around and assisting her. He claimed that his memory of the accident was limited, and that he could only recall driving into the creek in a diagonal direction.

Regarding the accident, Fitzpatrick explained that the front of the ATV rose slowly—more like a tilt than a rapid ascent, as one might see when a driver performs a wheelie—before it flipped over backwards. He then told the troopers that, when he emerged from the water, the rear tire of the ATV was near his head. The vehicle was almost entirely submerged. He tried to move the ATV, but could not do so because so much of it was under water. Fitzpatrick looked around but could not see any sign of Annemarie. After several minutes of searching for her, he placed the 911 call. He told the police that it was during the call that he spotted Annemarie's body floating near the opposite shore.

Fitzpatrick walked away from the incident relatively unscathed. He informed the troopers only that he felt some soreness in his legs. Otherwise, the accident that had caused Annemarie to drown had left him almost entirely uninjured.

Notably, Fitzpatrick told the PSP investigators that he and Annemarie were not experiencing any marital problems on or before June 6, 2012.

Meanwhile, on June 8, 2012, PSP troopers executed a search warrant on Fitzpatrick's residence. While on the property, the investigative team observed a large woodpile in a field behind the house. The stack of wood was partially covered by a blue tarp. On one side of the pile, there was clear evidence that a log had fallen off the pile. The investigators located an impression in the mud that they believed likely was caused by a fallen log, which also was surrounded by loose bark. These findings corroborated Annemarie's June 6 email message.

During the initial investigation on the night of Annemarie's death, a trooper had observed Annemarie's cell phone on a picnic table near the creek where she drowned. During the execution of the search warrant on June 8, 2012, PSP investigators tried to locate that phone, but were unsuccessful. They asked Fitzpatrick about the phone, but he claimed that he did not know where it was located. He suggested that he and his brother might have thrown it in the garbage when they were cleaning up the residence during the two days following Annemarie's death. Fitzpatrick told the troopers that he would let them know if he found the phone. This turned out to be untrue. As noted below, Fitzpatrick concealed the phone in order to cover up the fact that Annemarie had learned that he was engaged in an extramarital affair.

On June 9, 2012, three days after Annemarie's death and in light of the newly uncovered suspicious circumstances surrounding the drowning, authorities decided to have Annemarie's body autopsied. Barbara Bollinger, M.D., a forensic pathologist, conducted the autopsy at the Lehigh Valley Hospital. Dr. Bollinger determined that Annemarie had drowned, and concluded that the circumstances surrounding her death were suspicious. However, Dr. Bollinger could not determine the manner of death with any degree of certainty. During the examination of Annemarie's body, Dr. Bollinger found injuries to the head, neck, torso, buttocks, right and left hands, right and left arms, right

and left legs, right elbow, right forearm, left thigh, left knee, and lower back. Additionally, one of Annemarie's ribs had been broken. Notwithstanding Fitzpatrick's assertion that Annemarie had consumed a glass of wine during dinner on the night she died, a toxicology report showed no traces of alcohol or drugs in her system.

As the investigation unfolded, PSP troopers continued to suspect that Annemarie's death might not have been an accident. Investigators learned that much of Fitzpatrick's statement to them was not truthful. For instance, contrary to his claim that he and Annemarie were not experiencing marital problems, Fitzpatrick had been engaging in an affair with a woman named Jessica Georg. In emails and other communications, Fitzpatrick told Georg that he loved her and that he was going to end his marriage with Annemarie in order to be with her.

On June 2, 2012—four days before Annemarie died—Georg told Fitzpatrick that, if he wished to share a relationship with her, he would have to end his marriage. Fitzpatrick agreed, and he committed to discussing the matter with Annemarie. According to Georg, Fitzpatrick decided that, on the night of June 6, he was going to discuss a separation with Annemarie, and this was to be followed by a divorce. But on June 7, Fitzpatrick abruptly directed Georg to delete any Facebook messages between them and told her that the police might be interested in speaking with her. Fitzpatrick later admitted that he had hidden Annemarie's cell phone (the one that PSP troopers had searched for on his property) in an effort to conceal the affair from authorities.

The PSP also learned that Fitzpatrick was the beneficiary of Annemarie's life insurance policy. Under the policy's terms, upon Annemarie's death, Fitzpatrick would receive over $1.7 million dollars. Eventually, investigators searched Fitzpatrick's personal computer and reviewed his internet activity. They found that, on June 1, 2012—five days before Annemarie's death—Fitzpatrick had conducted an online search for "life insurance

review during contestability period." Notes of Testimony ("N.T."), 5/4/2015-5/13/2015, at 918. Four days later, he performed an online search for "polygraph legal in which states." *Id.*

Corporal Andrew Thierwechter, a PSP accident reconstructionist, attempted to reenact the accident in Muddy Creek according to Fitzpatrick's version of the events. Using forensic mapping, measurements, and simulations with an actual ATV, Corporal Thierwechter determined that, had the incident occurred in accordance with Fitzpatrick's account, both he and Annemarie would have been subjected to similar forces when the ATV flipped over. In Corporal Thierwechter's view, either both riders would have suffered similar injuries, or neither would have been injured at all. Corporal Thierwechter concluded that there was no reasonable way to explain how Annemarie could have suffered such significant injuries while Fitzpatrick suffered essentially none. Nor could he ascertain any reasonable explanation for how Fitzpatrick awoke next to the submerged ATV while Annemarie ended up on the other side of the creek.

Nearly two years after Annemarie's death, the PSP charged Fitzpatrick with homicide. The case originally was assigned to the Honorable Gregory M. Snyder. Prior to trial, Fitzpatrick filed an omnibus pre-trial motion, asserting, *inter alia*, that both the note written in Annemarie's day planner and the email that she had sent from her work email account to her private account were inadmissible hearsay and were not otherwise admissible under any established hearsay exception. The Commonwealth conceded that both statements were hearsay, but argued that the statements nonetheless were admissible as substantive evidence under the state of mind hearsay exception. *See* Pa.R.E. 803(3). Judge Snyder agreed with the Commonwealth, ruling that both statements were admissible. Thereafter, Judge Snyder was reassigned to the Family

Division of the York County Court of Common Pleas. Fitzpatrick's case was transferred to the Honorable Richard K. Renn for trial.

From May 4 through May 13, 2014, Fitzpatrick was tried for murder before a jury. Of critical importance to the Commonwealth's case against Fitzpatrick were the note, the email, and the testimonies of Dr. Bollinger and Corporal Thierwechter. Given its particular relevance here, Dr. Bollinger's testimony requires some further elaboration. Dr. Bollinger testified that, to a reasonable degree of medical certainty, the cause of Annemarie's death was drowning. While this conclusion was not disputed by the parties, the manner of death remained a central point of contention. With the assistance of charts and diagrams, Dr. Bollinger detailed for the jury the more than twenty-five injuries suffered by Annemarie. Dr. Bollinger opined that all of these injuries were the result of blunt force trauma. However, she explained as well that such trauma may have been inflicted during the resuscitation attempts or during the embalming process, which occurred prior to the autopsy. On cross-examination, Dr. Bollinger stated that the existence of injuries caused by blunt force trauma does not, *ipso facto*, mean that a criminal act caused those injuries.

At trial, Dr. Bollinger could not offer a definitive opinion on the manner of death. She explained that Annemarie's injuries *could have* been caused by being held underwater until she drowned. Because Fitzpatrick was the only person in the water with Annemarie, only he could have done that to her. In Dr. Bollinger's view, that made the death at least suspicious. However, Dr. Bollinger could not opine whether that, in fact, is what happened. She testified that none of the more than twenty-five injuries were indicative of any specific type of assault. Instead, she opined, Annemarie's injuries were "consistent with an accident," N.T. at 547, and that it was "possible" that those injuries were consistent with being held under water. *Id.* at 564. On re-cross-examination, defense counsel asked Dr. Bollinger the following question: "Dr. Bollinger, do you *equally*

agree that all of the injuries that you've described in depth here over the last few questions could also be caused as a result of an ATV accident?" *Id.* at 564-65 (emphasis added). Dr. Bollinger responded: "That is also possible." *Id.* at 565.

Fitzpatrick testified in his own defense. As he did when interviewed by PSP investigators, Fitzpatrick maintained that Annemarie had died in an ATV accident. Fitzpatrick told the jury that Annemarie must have inadvertently placed the vehicle in the reverse gear, such that when she accelerated the ATV flipped backwards, sending them both into the water. Fitzpatrick denied killing Annemarie intentionally.

The note and the email also played significant roles at trial, as evidenced by the Commonwealth's heavy reliance upon both. In her opening statement, the prosecutor stated:

> Joe Fitzpatrick didn't count on a couple of things. He couldn't foresee the fact that his wife Annemarie, she was suspicious, she suspected what he was capable of. She suspected that her own husband could harm her[, that] her own husband could do something to her. She was suspicious of it. So fearful in fact, that she left a note. She left a note at her work. A note that was dated on the very day that she died. She left it in a day planner on her desk. And the note said, if something happens to me, Joe. Signed. A. Fitzpatrick. See, the problem was for him, he couldn't see that his wife was on to him.

*Id.* at 170. Then, during summation, the prosecutor argued the following:

> Anne Marie's voice is here to tell you something else. On the day of her death, June 6, 2012, if something happens to me, Joe. Annemarie Fitzpatrick. If her voice is in this room, ladies and gentlemen, it's on this side of the courtroom. And that's what she wanted you to know.
>
> * * *
>
> June 6th is critical. It is absolutely critical. On June 6, 2012, what do we know. If something happens to me, Joe. Annemarie worked that day. And while she was at work, she took out her journal and she wrote on it, if something happens to me Joe.
>
> * * *

She sent a second e-mail. That second e-mail said, if something happens to me, Joe and I are having marital problems. Last night we almost had an accident where a huge log fell on me. Joe was on the pile with the log and had me untying a tarp directly below.

* * *

I will reemphasize just like the defense said he said Annemarie is telling you what to do. He's right, ladies and gentlemen. Annemarie told you if something happens to her, Joe.

*Id.* at 1214, 1231, 1233, 1256.

On March 13, 2015, the jury found Fitzpatrick guilty of first-degree murder. That same day, Judge Renn sentenced him to life in prison.

On May 22, 2015, Fitzpatrick filed post-sentence motions in which he challenged the weight and sufficiency of the evidence, as well as the admissibility of the note and the email. The parties presented oral argument to Judge Renn on August 6, 2015. In a September 1, 2015 order, Judge Renn denied Fitzpatrick's motion with regard to the weight and evidentiary issues. However, Judge Renn determined that the evidence was insufficient to support the murder conviction and granted Fitzpatrick a judgment of acquittal.

In a contemporaneously issued opinion, Judge Renn expressed his belief that Judge Snyder's pre-trial ruling regarding the admissibility of the note and the email was erroneous. Trial Court Opinion ("T.C.O."), 9/1/2015, at 17. However, Judge Renn concluded that he was bound by the "law of the case" doctrine. *Id.* That doctrine prohibits a subsequent judge of coordinate jurisdiction from overturning a ruling of a prior judge of the same jurisdiction unless there was an intervening change in the controlling law or in the facts, or if the prior ruling "was clearly erroneous and would create a manifest injustice if followed." *Id.* (quoting *Commonwealth v. Starr*, 664 A.2d 1326, 1332 (Pa. 1995)).

Finding no intervening change in the law or facts, Judge Renn concluded that only the "clearly erroneous" exception was a possibility. T.C.O. at 17. However, even though he would have ruled differently, Judge Renn did not believe that, based upon the state of the law, Judge Snyder's ruling could be deemed so "clearly erroneous" that Judge Renn could overrule it. *Id.*

Although he ultimately could not undo Judge Snyder's decision, Judge Renn nonetheless offered three reasons why he believed that neither the note nor the email— both of which were facially inadmissible hearsay statements—fell within the state of mind hearsay exception. First, Judge Renn explained that the statements did not tend to show Fitzpatrick's motive, intent, or plan. Rather, the statements vaguely showed Annemarie's state of mind. This was problematic because the use of the statement at trial operated to project Annemarie's state of mind onto Fitzpatrick. Stated otherwise, Annemarie's mindset was allowed for purposes of assisting in proving Fitzpatrick's intent. The exception only allows a state of mind statement to prove the declarant's motive, intent, plan, etc., not to prove someone else's. Additionally, Judge Renn opined that the vague nature of the statements combined with their improper use "[flew] in the face of the policy reasons behind hearsay exceptions." *Id.* at 19 (footnote omitted).

Second, Judge Renn noted that all evidence, including state of mind hearsay statements, must be relevant. The judge determined that Annemarie's belief regarding Fitzpatrick's motive was not relevant to prove what Fitzpatrick's actual motive was at the time of Annemarie's death. *Id.*

Third, Judge Renn explained that, per the terms of Rule 803(3), state of mind statements expressing a declarant's belief cannot be used to prove the underlying acts

that are committed consistent with the declarant's stated belief. In other words, Annemarie's statements suggesting a belief that, if something happened to her, Fitzpatrick would be the person responsible could not be used to prove that Fitzpatrick in fact was responsible if something happened to her. This substantive use of hearsay is available only when it relates to the validity or terms of a will. *Id.* at 20 (citing *Commonwealth v. Levanduski*, 907 A.2d 3, 19 (Pa. Super. 2006)). Because this was a murder case, and not a will contest, Annemarie's statements clearly could not be introduced to establish as objective fact something that Annemarie subjectively believed. *See id.*; *see also* Rule 803(3) (excluding from the state of mind hearsay exception "a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the decedent's will").

With regard to Fitzpatrick's challenge to the sufficiency of the evidence, Judge Renn first noted that he was bound to view the trial evidence in the light most favorable to the Commonwealth, as verdict winner, and also bound to draw all reasonable inferences in the Commonwealth's favor. T.C.O. at 5 (quoting *Commonwealth v. Feathers*, 660 A.2d 90, 95 (Pa. Super. 1995); citing *Commonwealth v. Aulisio*, 522 A.2d 1075, 1079 (Pa. 1987)). Judge Renn concluded that, even under this deferential standard, the Commonwealth had failed to prove the main issue in the case—whether Annemarie died by accident or by homicide—beyond a reasonable doubt: "[A]t best, the Commonwealth showed [that Fitzpatrick] had motive to kill his wife and perhaps even specific intent to kill his wife." *Id.* at 7. However, proof of intent is not the equivalent of proof that Annemarie in fact was unlawfully killed. Nor does proof of motive alone suffice to establish that a person was killed unlawfully. Motive is not an element of first-degree

murder. At most, it can assist the fact-finder in ascertaining the nature of a defendant's intent. Regardless, "the problem with the Commonwealth's evidence is that, while it might prove intent and motive, it in no way prove[d] beyond a reasonable doubt that an unlawful killing occurred." *Id.* "[F]or the jury to conclude that Annemarie Fitzpatrick was unlawfully killed," the jurors would have "to speculate that something untoward occurred at the creek." *Id.*

Judge Renn focused upon Dr. Bollinger's trial testimony. The court highlighted the fact that Dr. Bollinger repeatedly testified that Annemarie's blunt force trauma injuries could have been caused by an ATV accident, by being held underwater and drowned, by the resuscitation efforts, or even by the embalming process. Consequently, Judge Renn found that the Commonwealth's evidence created equally consistent premises, which was insufficient to prove beyond a reasonable doubt that Annemarie was killed unlawfully.

At the hearing on Fitzpatrick's post-sentence motions, the Commonwealth argued that the combination of Dr. Bollinger's testimony and the circumstantial evidence was sufficient to prove that Annemarie was murdered, and did not drown accidentally. When Judge Renn pointedly asked the Commonwealth to explain how Annemarie was killed, he was met with "a period of rather telling silence." *Id.* at 10. The Commonwealth speculated that perhaps Fitzpatrick dragged Annemarie into the creek, forcibly held her under the water until she drowned, and then staged a fake ATV accident. The Commonwealth was unable to provide any details to substantiate this theory.

Despite finding that the Commonwealth had no articulable, evidence-based theory of how Annemarie died, Judge Renn nonetheless reviewed the remainder of the Commonwealth's evidence to ascertain whether the balance of the circumstantial

evidence proved that Annemarie was unlawfully killed. Judge Renn identified nine relevant evidentiary items of value.

Judge Renn first assessed—in the light most favorable to the Commonwealth—the impact of Corporal Thierwechter's expert accident reconstruction testimony upon the manner of death question. The judge found that the corporal's testimony, which was based upon what the judge apparently determined were unpersuasive and unreliable testing parameters, served only to disprove Fitzpatrick's version of events, and little more. "Despite there being several unknown factors, including speed, and despite using a water logged ATV that did not run, Corporal Thierwechter opined that the accident did not occur in the way described by [Fitzpatrick.]" *Id.* at 10. However, Judge Renn noted, mere disbelief or disproof of a defendant's version of events is not the same as affirmative proof of something else—at least not beyond a reasonable doubt. The accident reconstruction testimony did not actually prove how the events in Muddy Creek unfolded.

Next, Judge Renn identified the remaining items of relevant evidence:

1. A handwritten note reading "If something happens to me -- Joe." The note is dated June 6, 2012, the date Annemarie died, and it is signed by her.

2. An email sent from Annemarie's work email address to her home email address with the subject line "If something happens to me." The body of the email reads, "Joe and I are having marital problems. Last night we almost had an accident where a huge log fell on me. Joe was on the pile with the log and had me untying a tarp directly below." This email was also sent June 6, 2012, the day she died.

3. $1.7 million dollar insurance policies that [Fitzpatrick] would receive upon his wife's death. At trial, the parties stipulated that Annemarie, who worked in insurance, took out all of these policies years before her death.

4. A non-sexual, extramarital affair between [Fitzpatrick] and Jessica Georg. Ms. Georg testified that she met [Fitzpatrick] in late April 2012. In their many pages of text messages, emails, and Facebook

communications, Ms. Georg testified that [Fitzpatrick] never spoke an ill word about his wife. In fact, he always spoke very highly of her and contemplated Annemarie being in his life for a long time because of their two children. Annemarie was also aware of the affair before she died.

5.      Two Google searches conducted on [Fitzpatrick's] work computer. The first one inquired about insurance contestability periods and the second one inquired about states [in which] polygraph tests are admissible. Both of these searches happened within the few days before Annemarie's death.

6.      [Fitzpatrick's] lie to the police concerning the whereabouts of Annemarie's cell phone. [Fitzpatrick] testified that he concealed the phone from the police because he did not want them finding out about the affair.

7.      [Fitzpatrick's] inconsistent statements about what happened on the night of June 6, 2012. [Fitzpatrick] initially told investigators he and Annemarie were down at the creek to celebrate their anniversary. He later said that they went down to discuss the state of their marriage. The Commonwealth states in its brief that [Fitzpatrick] initially stated he put the ATV into gear and then later said it was Annemarie.

8.      The house. There was also mention of [Fitzpatrick's] love for his home that he built from the ground up, implying that [Fitzpatrick] killed Annemarie because he did not want to lose the house. However, there was no evidence presented to show that [Fitzpatrick] would lose the house in a divorce or that he would not be able to afford the house without Annemarie's income.

*Id.* at 11-13 (citations to the notes of testimony omitted).

Continuing to view the evidence in the light most favorable to the Commonwealth, Judge Renn acknowledged that some of the circumstantial evidence was "suspect" and "did not cast [Fitzpatrick] in the most positive light." *Id.* at 14. However, according to Judge Renn, the evidence as a whole still required the jury to guess how Annemarie died. "Quite frankly, we think the only logical conclusion is that the jury based its verdict off of a mere speculation that something untoward occurred down at that creek." *Id.* (footnote omitted). Because our legal system requires more than just "gut feelings," Judge Renn had "serious and real concerns about the jury's verdict." *Id.* at 15. "If [Fitzpatrick] did

unlawfully kill another human being, the Commonwealth did not prove it; suspicions and gut feelings are far from beyond a reasonable doubt." *Id.* at 15. Thus, Judge Renn granted Fitzpatrick's post-sentence motion for a judgment of acquittal.

Both parties appealed to the Superior Court. In a unanimous opinion, the Superior Court reversed the order vacating Fitzpatrick's judgment of sentence. *Commonwealth v. Fitzpatrick*, 159 A.3d 562, 564, 572 (Pa. Super. 2017). After setting forth the correct standard of review and outlining the elements of first-degree murder, *id.* at 567-68, the appellate court determined that the evidence was sufficient to support Fitzpatrick's first-degree murder conviction, explaining its reasoning as follows:

> Our review of the record reflects that each of the three elements of first-degree murder was proven beyond a reasonable doubt. At trial, the Commonwealth presented the testimony of forensic pathologist, Dr. Barbara K. Bollinger, who performed [Annemarie's] autopsy three days after the murder. Dr. Bollinger opined that the manner of death was drowning. Further, Dr. Bollinger testified to the multiple injuries appearing on [Annemarie's] body, which totaled at least twenty-five. She stated that [Annemarie] had fourteen or more injuries about her torso, eight injuries to her upper extremities, and at least twelve injuries about her lower extremities. Specifically, Dr. Bollinger documented the following injuries to [Annemarie]: bruises over the upper and lower lip; bruises over the right temporal region of the head and bruises to the upper right portion of the head; hemorrhages about the back of the head and about the mid aspects of the head; hemorrhages on the right side of the neck within the muscles of the neck; three bruises to the scapular regions; a patterned bruise on the infrascapular region; several bruises to the right kidney region; abrasions on the left buttock; a bruise on the right buttock; a bruise between the breasts; a small bruise in the right lower abdominal quadrant; a bruise near the shoulder where the [Annemarie's] left arm and shoulder meet; a bruise along the left side of the torso that continued to the backside; bruises above the left hip area; a small scratch of the skin in the groin region; bruises on the back of the left thigh; a bruise on the outer aspect of the left foot; a bruise on the back of the right leg; scattered abrasions on the right leg and a severe laceration to the great toe; abrasions and contusions to the upper and lower parts of both of the arms; scratching and bruising about both of the elbows; scrapes and contusions on the back of both hands.
>
> In addition, Dr. Bollinger opined that, within a reasonable degree of medical certainty, the various bruises and injuries [Annemarie] suffered could have

resulted from [Annemarie] being held under the water in a creek by another person and drowning. Furthermore, repudiating [Fitzpatrick's] claim that [Annemarie] drowned in an ATV mishap involving both [Fitzpatrick] and [Annemarie], Dr. Bollinger opined that "the lack of injuries to [Fitzpatrick] did not correspond with [Fitzpatrick's] rendition of the scene circumstances [regarding] what occurred at the time of Annemarie's drowning." Accordingly, this evidence was sufficient for the jury to conclude beyond a reasonable doubt that [Annemarie] was unlawfully killed by being drowned in the creek. Thus, we conclude that the Commonwealth established the first element of the crime of first-degree murder.

With regard to the second element of first-degree murder, the evidence likewise established that the Commonwealth proved that [Fitzpatrick] was responsible for killing [Annemarie]. Indeed, it is undisputed that [Fitzpatrick] and [Annemarie] were alone on the property at the time that [Annemarie] drowned in the creek. Trooper Grothey testified that during the initial investigation, [Fitzpatrick] explained that he and [Annemarie] were celebrating their thirteenth wedding anniversary at the time of the incident and that their two children were staying with [Fitzpatrick's] parents. [Fitzpatrick] has not disputed this fact. Thus, [Fitzpatrick] was the only person who could have held [Annemarie] underwater in the creek, thereby making him responsible for the killing.

Concerning the issue of specific intent possessed by [Fitzpatrick], the Commonwealth presented ample evidence of the couple's estranged relationship, including the fact that [Fitzpatrick] was in the midst of an extramarital relationship with another woman, Jessica Georg. [Fitzpatrick] indicated to Ms. Georg that he was nervous about losing his house and his children in a separation or divorce. In addition, Ms. Georg read into the record a Facebook post authored by [Fitzpatrick] to Ms. Georg two weeks prior to the murder, which provided, in relevant part, as follows:

> My children love their home and I would not want to take that from them. I know you are [a] package deal and have frankly thought about how I could change the girls['] rooms to accommodate your girls. But they are the easy things to get past. The hardest will be my separation.

Also, on June 1, 2012, [Fitzpatrick] sent Ms. Georg an email which Ms. Georg described as follows, "[Fitzpatrick] wrote, I love you, in all caps with more exclamation points tha[n] I can count."

On the evening of June 2, 2012, [Fitzpatrick] sent the following Facebook message to Ms. Georg:

> Can't believe how I've fallen in love with you in such a short period of time. It's crazy when you step back and think about

it. I feel like I'm in a jail cell. Wanting something I can't have. So it hurts real bad. I believe you feel the same. I understand your position. Single, want to be with someone, have a man pursuing you that you have been intimate with, so you are torn and want satisfaction. Understanding this, I tried to push the limits, take risks at getting caught prematurely to develop what I truly believe will be something that few people on this earth get to experience. My life is riddled with so many emotions, it's hard to comprehend. I want to be yours. I want to help you pack, move, do whatever I can to help you, but I can't. It feels like something is sticking in my chest with a knife. I hate feeling this way. So tears are filling my eyes because I guess I have to say good-bye [*sic*] until things are appropriate.

Ms. Georg also testified that on the afternoon of the murder, [Fitzpatrick] sent Ms. Georg multiple text messages. One of the text messages from [Fitzpatrick] stated, "[R]eally miss you." The next text message from [Fitzpatrick] to Ms. Georg exclaimed, "And really really really feel I was made for you." Another text message from [Fitzpatrick] stated, "Yes. But it is true I love you."

In addition, on that same afternoon [Fitzpatrick] sent Ms. Georg a text message with the lyrics of the song "You Are My Sunshine," and the comment, "Well, maybe one day you won't need to buy another property." [Fitzpatrick] ended that particular text message with the statement, "Love you. XOOOOO."

The Commonwealth also presented stipulated evidence of the existence of a total of $1,714,000 in life insurance policies upon [Annemarie], with [Fitzpatrick] being the designated beneficiary of those policies. In addition, it was stipulated that on the morning of June 1, 2012, [Fitzpatrick] conducted a Google search on his work computer using the words "life insurance review during contestability period." This cumulative evidence, although circumstantial, viewed in the light most favorable to the Commonwealth, is sufficient to establish a motive for [Fitzpatrick's] murder of [Annemarie], thereby satisfying the necessary element of intent.

In conclusion, the record, viewed in the light most favorable to the Commonwealth, reflects that the Commonwealth established [that Annemarie] was unlawfully killed and that [Fitzpatrick] committed the murder with the requisite motive and intent. Accordingly, we reverse the order granting [Fitzpatrick's] motion for judgment of acquittal, and remand for reinstatement of the jury verdict on the charge of first-degree murder and judgment of sentence.

*Id.* at 568-70 (citations to the notes of testimony and a footnote omitted).

Lastly, the panel determined that the order that was appealed by both parties, which granted Fitzpatrick relief by vacating his judgment of sentence, actually did not aggrieve Fitzpatrick. Because only an aggrieved party may appeal an order, the Superior Court quashed Fitzpatrick's appeal. *Id.* at 572.

On December 6, 2017, Judge Renn reinstated Fitzpatrick's conviction and life sentence. Fitzpatrick filed post-sentence motions again, which Judge Renn denied. Fitzpatrick then appealed to the Superior Court, contesting the admissibility of the note and the email. *See Commonwealth v. Fitzpatrick*, 204 A.3d 527, 529, 530-31 (Pa. Super. 2019).

The Superior Court noted that the admissibility of a murder victim's statements under the state of mind hearsay exception has generated conflicting opinions among panels of that court. *Id.* at 532 (listing cases). The Superior Court proceeded to hold that the day planner note was "admissible under the state-of-mind exception," because it "tended to establish [Annemarie's] then-existing belief, *i.e.*, her state of mind, which was relevant to show the ill will that [Annemarie] perceived from Fitzpatrick, and, by implication, that their marriage was not going well." *Id.* at 532. Contradictorily, the panel then opined that the note "was not offered for the truth of the matter asserted and therefore was not hearsay." *Id.* In other words, the Superior Court held that the note was hearsay that was admissible under the state of mind exception—which would allow it to be offered for its truth as substantive evidence—but then simultaneously concluded that it was not being offered for the truth of the matter asserted and was not hearsay at all.

Conversely, the Superior Court found that the email was inadmissible. The court reasoned that the email was not an expression of Annemarie's then-existing state of mind. Rather, it was a statement of her "memory or belief to prove the fact remembered," which is an impermissible use of the statement under the express terms of Rule 803(3) (unless

related to the terms of a will). *Id.* at 533 (quoting Pa.R.E. 803(3)). This error, the panel concluded, was harmless in light of what the court found to be overwhelming evidence of guilt. Notably, however, the Superior Court did not review the record anew to ascertain whether the "properly admitted and uncontradicted evidence of guilt was so overwhelming." *Id.* (quoting *Commonwealth v. Laich*, 777 A.2d 1057, 1062 (Pa. 2001)). Instead, the court relied almost exclusively upon a portion of the sufficiency of the evidence analysis that the court performed during the prior appeal in this case.

The problem, of course, is that a sufficiency analysis and a harmless error analysis are not the same, and require different evaluations of the evidence. In a sufficiency review, the appellate court must review the evidence in the light most favorable to the Commonwealth, and must draw all reasonable inferences for the Commonwealth. *See Commonwealth v. Smith*, 234 A.3d 576, 581 (Pa. 2020). On the other hand, when reviewing for harmless error, the appellate court considers only the uncontradicted evidence and, having done so, proceeds to determine whether that body of uncontradicted evidence was so overwhelming that the erroneous admission of the evidence could not have impacted the verdict. *Laich*, 777 A.2d at 1062. These two inquiries are not the same. Nonetheless, the Superior Court conflated the two and held that the admission of the email was harmless.

Fitzpatrick filed a petition for allowance of appeal, which this Court granted to address the following issues:

1.  Whether a note written by a victim of a homicide at some unknown time before the author's death saying "if something happens to me -- Joe" is admissible under the state of mind exception to the ban on hearsay as embodied in Pennsylvania Rule of Evidence 803(3)?

2.  Where inculpatory hearsay is improperly admitted against an accused, may a reviewing court dismiss the claim by averring the evidence was not offered for its truth if the jury was not so instructed

and the statement was instead argued for its truth and is core to the prosecution case?

*Commonwealth v. Fitzpatrick*, 223 A.3d 1287 (Pa. 2020) (*per curiam*).

Stated simply, the primary question in this case is whether the note that Annemarie wrote in her day planner—"If something happens to me—JOE"—satisfies the state of mind hearsay exception and, thus, was admissible for its truth at Fitzpatrick's trial. This is an evidentiary question, which requires application of a well-settled standard of review. "Questions concerning the admissibility of evidence are within the sound discretion of the trial court, and this Court will not reverse the trial court's decision absent an abuse of that discretion." *Laich*, 777 A.2d at 1060 (citation omitted).

Hearsay is "a statement . . . the declarant does not make while testifying at the current trial or hearing . . . [that is offered] in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c)(1)-(2). Statements that meet this definition are not admissible, unless the proffered statement falls within an established hearsay exception. *See id.* 802. In this case, Annemarie's note was offered into evidence by the Commonwealth as "admissible hearsay, and the reason is because it goes to the state of mind exception to the [h]earsay rule." *See* N.T., 10/20/2014, at 96. Judge Snyder agreed that the exception applied, and that the statement could be submitted to the jury as substantive evidence for the truth of the matter asserted in the note. Stated otherwise, Judge Snyder's ruling permitted the jury to consider the existence of the note as proof of the note's allegation: that if something happened to Annemarie, Fitzpatrick was to blame. We must now decide whether this decision—which allowed the jury to infer Fitzpatrick's *mens rea* from Annemarie's subjective belief, effectively enabling her to identify Fitzpatrick as her killer from the grave—was correct, *i.e.*, whether the note constituted an expression of Annemarie's then-existing state of mind, and thus was admissible as an exception to the rule against hearsay. We hold that it was not.

Before proceeding further, we first must distinguish between the two ways in which a declarant's state of mind can be invoked as a basis for admitting a declarant's out-of-court statement in a legal proceeding. The two often are conflated by courts and practitioners alike. *See Commonwealth v. Stallworth*, 781 A.2d 110, 127 (Pa. 2001) (Saylor, J., concurring and dissenting) (noting that "this distinction has engendered considerable confusion" in Pennsylvania jurisprudence).[5] The critical feature that differentiates the two evidentiary proffers is the purpose for which the statement is being offered. If the statement is not being offered for its truth, but instead "to show the mental state of the person making" it, *Commonwealth v. Auker*, 681 A.2d 1305, 1319 (Pa. 1996), the statement is admissible only for that limited purpose, and should be accompanied with an accurate limiting instruction to the jury. Such a statement is not admissible as substantive evidence, and cannot be admitted for the truth of the matter asserted.

Indeed, when not offered as substantive proof, the truth of the statement is wholly immaterial. The statement could be something outrageous or impossible—such as "I can fly to the moon." That would not be hearsay at all, as it is meant only to demonstrate to the judge or jury the character of the speaker's mindset at the time of its utterance. *See* 2 McCormick on Evidence § 274 (8th ed.) (explaining that state of mind statements that are not hearsay are not dependent upon the manner in which the statement is uttered or the truth or practicability of the statement). In this example, the statement would be offered to show that the speaker may have been mentally impaired or delusional at the

---

[5] As noted earlier, the Superior Court panel failed to appreciate the evidentiary distinction between state of mind evidence that is offered for the truth of the matter and state of mind evidence that is not. *See Fitzpatrick*, 204 A.3d at 532 (holding that Annemarie's note both satisfied the state of mind hearsay exception, and thus could be admitted as substantive evidence, while simultaneously finding that the note was not offered for the truth of the matter asserted therein).

time. It would not be introduced to prove that he (or she) actually can fly to the moon. This non-truth purpose of state of mind evidence is not at issue in this case.

Instead, this case implicates the second situation in which the invocation of a declarant's state of mind permits the admission of hearsay: when the out-of-court statement is offered to prove the truth of the matter asserted. Technically, such a statement is hearsay. However, then-existing state of mind statements long have been excepted from the hearsay rule because they possess the "special assurance of reliability" due to "their spontaneity and resulting probable sincerity. The guarantee of reliability is assured principally by the requirement that the statements must relate to a condition of mind or emotion existing at the time of the statement." *Id.* (footnotes omitted).

In Pennsylvania, the admissibility of then-existing state of mind statements is governed by Rule of Evidence 803(3), which provides as follows:

> **Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3). "Pursuant to the state of mind hearsay exception, where a declarant's out-of-court statements demonstrate her state of mind, are made in a natural manner, and are material and relevant, they are admissible pursuant to the exception." *Laich*, 777 A.2d at 1060-61. Axiomatically, and by its unambiguous terms, the exception renders admissible only those statements that reflect the "declarant's then-existing state of mind . . . or condition," Pa.R.E. 803(3), not someone else's state of mind or condition. Nothing in the plain terms of the exception would allow, for instance, a party to introduce an out-of-court statement of one person to prove the intent, motive, feelings, pain, or health of another person. The bounds of the exception are limited to the then-existing state of mind of the declarant only.

The statement at issue *sub judice* is not a routine state of mind expression. Rather, it is a compound statement that both demonstrates the speaker's then-existing state of mind and, when offered for the truth of the matter asserted, proves a fact that, if considered on its own, would be inadmissible hearsay. Annemarie's note, written the day before Annemarie died and signed by her, stated, "If something happens to me—JOE." On one hand, the statement reflects Annemarie's state of mind at the time she wrote it. Annemarie clearly was distressed and troubled over the nature of her then-existing relationship with Fitzpatrick, to the point that she appeared to be apprehensive of him. Such feelings and emotions, assuming they are expressed in an out-of-court statement without any other facts or assertions tethered to the statement, generally are admissible under the state of mind hearsay exception. For instance, had Annemarie written that she was "afraid of Joe," the statement (subject to other rules of evidence) would have been admissible to prove the truth of that assertion, that she was in fact afraid of Joe, so long as that fear was relevant to a contested issue in the case, a requirement that we discuss in more detail below.

On the other hand, Annemarie's statement also contained a factual assertion: that Fitzpatrick would be the perpetrator if something untoward or violent happened to her. The fact-based aspect of the statement, when offered for the truth of the matter asserted, is inadmissible hearsay. *See Commonwealth v. Chmiel*, 738 A.2d 406, 417 (Pa. 1999) (explaining that, generally, each aspect of a statement must be admissible before the entirety of it may be admitted). Thus, the question for this Court is whether compound statements such as the note written by Annemarie nonetheless are admissible in their entirety as state of mind evidence under Rule 803(3).

The admissibility of state of mind statements, including dual-purpose statements that proverbially point the finger from the grave or establish someone else's mindset, has

vexed courts—including this Court—for many years. In 1933, the United States Supreme Court considered the admissibility of such a statement in *Shepard v. United States*, 290 U.S. 96 (1933). In that case, Shepard, a major in the medical corps of the United States Army, had fallen in love with a woman other than his wife. *Id.* at 97. In order to extricate himself from his marriage and pursue his newfound love, Shepard decided to kill his wife by poisoning her. *Id.* at 98.

On May 22, 1929, Shepard's wife took a drink of whiskey and collapsed. While lying ill in bed, Mrs. Shepard became suspicious and directed her nurse to retrieve the whiskey bottle from which she drank. Mrs. Shepard believed that the taste and smell of the liquor was abnormal and expressed a wish to have it tested for poison. She then declared to the nurse, "Dr. Shepard has poisoned me." *Id.* Mrs. Shepard later died. Shepard was arrested and charged with her murder.

The central issue at trial became whether Mrs. Shepard was, in fact, murdered or whether she had committed suicide, a theory supported by a number of witnesses presented by the defense. *Id.* at 102. Mrs. Shepard's statement was critical to that assessment. The jury determined that she was murdered, and convicted Shepard of her murder.

On appeal to the Supreme Court of the United States, Justice Benjamin Cardozo, writing for a unanimous Court, framed the issue in the case as follows:

> She said, 'Dr. Shepard has poisoned me.' The admission of this declaration, if erroneous, was more than unsubstantial error. As to that the parties agreed. *The voice of the dead wife was heard in accusation of her husband*, and the accusation was accepted as evidence of guilt. If the evidence was incompetent, the verdict may not stand.

*Id.* at 98 (emphasis added). The Court first rejected the theory that Mrs. Shepard's statement was a dying declaration. *Id.* at 99-102. Then, and pertinent to our present

purpose, the Court proceeded to analyze whether the statement was admissible as state of mind evidence.

Justice Cardozo noted that the evidence never was offered as state of mind evidence at trial. It only was portrayed as a dying declaration. *Id.* at 102-03. That procedural defect notwithstanding, Justice Cardozo then explained why the statement could not be admitted as evidence of Mrs. Shepard's state of mind.

At trial, Shepard attempted to prove that Mrs. Shepard had committed suicide. Perhaps, Justice Cardozo pondered, the statement could have been used as fair rebuttal to that defense. After all, Shepard opened the door, and the prosecution might have used Mrs. Shepard's utterance to prove that she had a "different state of mind, declarations consistent with the persistence of a will to live." *Id.* at 104. Shepard would have had no fair objection to such a use. The prosecution, however,

> did not use the declarations by Mrs. Shepard to prove her present thoughts and feelings, or even her thoughts and feelings in times past. It used the declarations as proof of an act committed by some one [*sic*] else, as evidence that she was dying of poison given by her husband. This fact, if fact it was, the government was free to prove, but not by hearsay declarations. It will not do to say that the jury might accept the declarations for any light that they cast upon the existence of a vital urge, and reject them to the extent that they charged the death to some one [*sic*] else. . . . The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed.

*Id.* at 104. Justice Cardozo pointedly remarked, "[w]hen the risk of confusion is so great as to upset the balance of advantage, the evidence goes out." *Id.* Finally, Justice Cardozo noted that the Court's ruling was merely a "guide to judgment" in the case, and that there "are times when a state of mind, if *relevant*, may be proved by contemporaneous declarations of feeling or intent." *Id.* (emphasis added).

Justice Cardozo's relevance requirement remains an essential aspect of the admissibility of state of mind declarations. A statement proffered under the state of mind

hearsay exception is not *per se* admissible merely because it is an expression of the speaker's then-existing mindset, with nothing more. The statement must also go to a "factor in issue"—*i.e.*, it must be relevant to some contested aspect of the case. *Laich*, 777 A.2d at 1061 (citation omitted). "The victim's emotional state must relate to some legitimate issue in the case." 2 McCormick on Evidence § 276 (8th ed.). Finding relevance in a victim's mindset in a criminal case is fairly uncommon. Indeed, a crime victim's state of mind typically is irrelevant and, thus, inadmissible. In murder cases in particular, it is the defendant's "state of mind, not that of the victim, which [is] material to establish the degree of guilt, if any, on the charge of criminal homicide." *Commonwealth v. Thornton*, 431 A.2d 248, 251 (Pa. 1981); *see also Laich*, 777 A.2d at 1061-62; *Stallworth*, 781 A.2d at 127 (Saylor, J., concurring and dissenting) (citing *Woods v. State*, 733 So.2d 980, 987 (Fla. 1999) (observing that "a homicide victim's state of mind prior to the fatal event generally is neither at issue nor probative of any material issue raised in the murder prosecution")).

Nonetheless, in criminal cases:

> the courts have developed three rather well-defined categories in which the need for such statements overcomes almost any possible prejudice. The most common of these involves defendant's claim of self-defense as justification for the killing. When such a defense is asserted, a defendant's assertion that the deceased first attacked him may be rebutted by the extrajudicial declarations of the victim that he feared the defendant, thus rendering it unlikely that the deceased was in fact the ag[g]ressor in the first instance. Second, where defendant seeks to defend on the ground that the deceased committed suicide, evidence that the victim had made statements inconsistent with a suicidal bent are highly relevant. A third situation involves a claim of accidental death, where, for example, defendant's version of the facts is that the victim picked up defendant's gun and was accidentally killed while toying with it. In such cases the deceased's statements of fear as to guns or of defendant himself (showing he would never go near defendant under any circumstances) are relevant in that they tend to rebut this defense. Of course, even in these cases, where the evidence is of a highly prejudicial nature, it has been held that it must be excluded in spite of a significant degree of relevance.

*United States v. Brown*, 490 F.2d 758, 767 (D.C. Cir. 1973).

Because the central dispute in this case was whether Annemarie died in an ATV accident or whether she was murdered by Fitzpatrick, Annemarie's note clearly was relevant under the third category identified by the *Brown* Court: to dispute a claim of accident. However, relevance is only one factor in the analysis. The evidence remains subject to other rules of evidence, including the hearsay rule. *See Stallworth*, 781 A.2d at 127 (Saylor, J., concurring and dissenting).

As noted, Annemarie's statement was not merely an expression of her state of mind. The note also implicated Fitzpatrick's state of mind and contained a factual assertion expressing Annemarie's belief that, if something violent were to happen to her, Fitzpatrick would be the perpetrator. The additional "fact-bound" layer has troubled this Court and has "been a subject of difference in this Court's recent decisions." *Commonwealth v. Moore*, 937 A.2d 1062, 1069, 1070 (Pa. 2007). In some cases, we have taken a broad view of the admissibility of this type of state of mind statement. In others, we have considered the statements in a more circumscribed fashion. *Id.* at 1070-71.

This Court viewed state of mind evidence broadly in *Commonwealth v. Fletcher*, 750 A.2d 261 (Pa. 2000).[6] In that case, Fletcher walked up to a group of people standing in front of a house that was part of drug distribution operation and asked one of them about money that he believed belonged to him. *Id.* at 278-79. Before the man could respond, Fletcher pulled out a gun and shot him three times. *Id.*

---

[6] *Fletcher* was overruled by *Commonwealth v. Freeman*, 827 A.2d 385 (Pa. 2003), because it turned on the Court's invocation of the formerly available relaxed waiver doctrine. Nothing in *Freeman* questioned the *Fletcher* Court's substantive analysis of Fletcher's ineffective assistance of counsel or evidentiary claims.

A witness opined to the police that Fletcher's motive for killing the victim was punishment for failing to sell certain drugs for Fletcher. In a written statement, the witness recounted an earlier conversation that he had with the victim. The victim told the witness that Fletcher had given him drugs to sell, but that, instead of selling the drugs, he had consumed them. *Id.* at 275-76. At trial, the witness denied telling the police about the victim's statement. The Commonwealth introduced the witness' written statement as both substantive evidence and as impeachment evidence. *Id.* at 275.

On appeal, Fletcher argued that counsel was ineffective for failing to object to the admission of the statement. This Court rejected that argument, observing only that, the statement "was relevant in establishing the victim's state of mind regarding his relationship with [Fletcher] and was therefore admissible under the state-of-mind hearsay exception to establish the presence of ill will, malice or motive for the killing." *Id.* at 276 (citations and quotation marks omitted). The Court's broad approach to admissibility hinged entirely upon the relevance of the statement. Although that statement was offered as substantive evidence, *i.e.*, for the truth of the matter, the Court did not conduct an independent analysis of the state of mind exception.

Justice Saylor issued a brief concurring opinion, expressing, *inter alia*, his belief that the statement was not admissible under the state of mind hearsay exception. In his view, the victim's assertion constituted a statement of memory or belief about a past event, which inherently is less reliable than a spontaneous expression of the speaker's then-existing mindset. *Id.* at 281 (Saylor, J., concurring and dissenting). Accordingly, Justice Saylor found Fletcher's ineffectiveness claim to be arguably meritorious, although he discerned no prejudice from its admission under the circumstances.

This Court also took a similarly expansive, relevance-based view of the admissibility of such statements in *Commonwealth v. Stallworth*. In that case, during a

murder and burglary prosecution, the Commonwealth introduced evidence that the murder victim sought and obtained a protection from abuse order against Stallworth. *Stallworth*, 781 A.2d at 114. In the petition for the protection order, the victim identified three instances in which Stallworth had threatened her. *Id.* at 117. The statements were admitted against Stallworth at trial, and he was convicted of both first-degree murder and burglary. Following his death sentence, Stallworth appealed to this Court, arguing, *inter alia*, that the threatening statements were inadmissible hearsay.

With little elaboration, the Court broadly held that the "evidence was indicative of the victim's state of mind in this regard and was clearly relevant" to the licensed-or-privileged-to-enter element of the burglary charge. *Id.* at 118. The Court declared that the evidence was "used, not to demonstrate the truth of the matters asserted in the [] petition, but to demonstrate the victim's state of mind regarding" Stallworth. *Id.* Unfortunately, the Court did not explain how the victim's state of mind "regarding" Stallworth was relevant to the case.

As in *Fletcher*, Justice Saylor dissented from the Court's evidentiary ruling, which he believed emanated from the prevalent conflation of state of mind statements that are offered for the truth of the matter asserted with those that are not. *Id.* at 126 (Saylor, J., concurring and dissenting). Justice Saylor began with the latter, noting that the Commonwealth had argued that the statements were admissible merely to show the victim's state of mind, regardless of the truth of the statements. He found this rationale to be unavailing, citing the long-standing principle that, in a murder case, a victim's state of mind is irrelevant. Thus, if the threatening statements were not offered for their truth, they were patently inadmissible. *Id.* at 127.

The Commonwealth also argued that the statements were relevant to show the toxic state of the relationship between the victim and Stallworth, which could be

introduced at trial to prove Stallworth's intent, motive, or both. However, Justice Saylor explained that the only way that the statements legitimately could be relevant to prove Stallworth's intent or motive would be if the statements were considered for their truth. The statements could not contemporaneously be relevant (offered for truth) and non-hearsay (not offered for their truth).

Having rejected the non-hearsay purpose, Justice Saylor next considered whether the statements met the state of mind hearsay exception so as to permit their admission for the truth of the matters asserted. He would have held that the statements were inadmissible. Although basic state of mind statements generally are deemed reliable because of their strong indicia of reliability, the additional fact-based aspects of a compound state of mind expression are not inherently reliable and, conversely, implicate a high potential for incurable prejudice. *Id.* at 128-29 (citations omitted). Fact-bound assertions attached to state of mind statements lack the spontaneity and sincerity that characterize traditional state of mind statements. Instead, statements such as threats to a victim constitute "statements of the victim's memory about the past, not statements of her then-existing state of mind." *Id.* (citation omitted). Due to the potential for prejudice, courts have limited the admission of such statements to the very limited circumstances when the victim's mindset directly is implicated in the case, such as when the defendant claims self-defense or asserts that the death was an accident or suicide. Only under those circumstances would the probative value outweigh the prejudice from admitting this type of evidence. Finding that no such circumstances were implicated in the case, and that the ultimate purpose for the statements was to prove Stallworth's motive, Justice Saylor rejected the Court's broad view of the admissibility of the evidence. Instead, he would have applied the more limited analysis, and would have found the threatening statements to be inadmissible. *Id.* at 130-31.

In three other cases, this Court took the more limited approach. In *Commonwealth v. Thornton*, Larry Moore had assaulted the sister of Elgin and Benny Thornton. When the police arrested Moore, he was carrying a gun. The police asked him why he had a gun, and he replied that the "Thornton brothers were after him." *Thornton*, 431 A.2d at 251 (citation to notes of testimony omitted). The Thornton brothers tracked Moore down and killed him. At trial, the Commonwealth offered Moore's statement to the police as substantive evidence. In Elgin Thornton's appeal, the Commonwealth asserted that the statement that the "Thornton brothers were after me" evinced Moore's fear—his state of mind—and was admissible under the state of mind exception.

This Court rejected the argument. Although the statement indeed established the victim's fear of the Thornton brothers, the victim's mindset was not relevant in the case. It is the defendant's, not the victim's, state of mind that is at issue in a homicide case. The statement is only relevant if it is offered for its truth, that the Thornton brothers in fact were after Moore. When the statement is offered for that purpose, however, this Court held that it "is incompetent and hence inadmissible." *Id.* We further reasoned that the statement did not fall within any established hearsay exceptions, including the state of mind exception.

In *Commonwealth v. Laich*, a double-murder case, Laich had caught his paramour having a sexual encounter with another man. Laich forced his way into her apartment and shot both his paramour and her sexual partner. *Laich*, 777 A.2d at 1059. He then drove to his father's house, called 911, and reported the shootings.

At trial, Laich argued that the killings were not intentional, premeditated first-degree murders. Instead, he claimed to have acted in the heat of passion, and that he thus could only be convicted of voluntary manslaughter. To counter this defense, the Commonwealth called a witness who had spoken with Laich's paramour approximately

one week before the killing. The witness testified that the victim told the witness that Laich had warned the victim that "if he ever caught her with another man, he would kill them both." *Id.* at 1060 (references to notes of testimony omitted).

The statement was admitted at trial as evidence of the victim's state of mind with regard to the state of the relationship between her and Laich. This Court reversed, finding that the victim's state of mind was irrelevant. The only issue in the case was whether Laich acted with specific intent to kill, such that he was guilty of first-degree murder, or whether he acted under the influence of a sudden and intense heat of passion, such that he was guilty of voluntary manslaughter. In other words, only Laich's mindset was relevant to the issue in the case. The victim's state of mind was not. *Id.* at 1062.

Finally, in *Commonwealth v. Moore*, a capital case, Moore and two others had directed a taxicab to pursue a person that had punched Moore. 937 A.2d at 1064-65. Eventually, they located the individual. Moore exited the taxicab and shot the individual three times. *Id.* at 1065. At Moore's subsequent murder trial, the Commonwealth sought to prove that Moore's motive for killing the victim stemmed from a prior interaction in which the victim defended himself against Moore's persistent bullying. The Commonwealth presented testimony from the victim's family members, a friend, and a police officer, each of whom testified that Moore had bullied, assaulted, and robbed the victim from the time that Moore and the victim were children. Eventually, the victim had decided that he would take no more of Moore's harassment and defended himself by punching Moore. According to the Commonwealth's theory of motive, Moore then killed the victim in retaliation for the punch. *Id.*

Relevant here, Moore challenged the admissibility of the testimony establishing his long-term bullying of the victim under Rule 803(3), contending, *inter alia*, that such fact-based statements do not qualify as state of mind evidence, nor were they relevant to any

issue in the case. *Id.* at 1069-70. Moore argued that the evidence established only the victim's state of mind, not Moore's, and that only the defendant's mindset is at issue in a murder case. *Id.* at 1070. The Commonwealth countered that the evidence demonstrated that Moore was "furious that a person whom he bullied for years had the audacity to fight back." *Id.*

This Court, in an opinion by Justice Saylor, reviewed the two different approaches that have arisen in our case law, as outlined above. We first rejected the Commonwealth's exclusive reliance upon *Fletcher's* broader approach to admissibility. *Fletcher*, we explained, effectively permits the admission of hearsay evidence that does little more than touch upon a victim's state of mind in a murder case. However, this approach was in "substantial tension with the limitations described and applied" in our other decisions. *Id.* at 1071. Our other decisions, even ones such as *Stallworth* that have adopted a more lenient approach, only permit the use of a declarant's state of mind to prove the motive or mindset of the *defendant* when that evidence is not offered for the truth of the matter asserted. *Id.* (citing *Stallworth*; *Laich*). When offered for the truth of the matter asserted, the statements necessarily are inadmissible hearsay.

In other words, even when relevant to a contested issue in the case, a declarant's "fact-bound" statement, *id.* at 1070, 1073, when offered as substantive evidence, is inadmissible to prove someone else's state of mind or to prove the fact, memory, or belief expressed in the statement. Thus, in *Moore*, while the testimony establishing that Moore bullied the victim circumstantially demonstrated the victim's fear of Moore, that evidence "could not properly be admitted as substantive evidence of these prior incidents." *Id.* at 1072. We concluded that the Commonwealth's "allusions to the victim's state of mind" were "tangential, and it [was] readily apparent that the state of mind hearsay exception was used as a conduit to support the admission of fact-bound evidence to be used for a

substantive purpose." *Id.* at 1072-73 (footnote omitted). Thus, *Moore* holds that state of mind statements that also contain a fact-bound element that implicates the defendant in the crime or, at minimum, implicates the defendant's state of mind generally are inadmissible.

Nonetheless, in *Moore*, Justice Saylor astutely observed that our cases concerning state of mind evidence have been inconsistent, *id.* at 1070, which undoubtedly has caused some confusion for the bench and bar in this complex area of evidentiary law. Thus, to ensure clarity going forward, we set forth the general inquiry courts must undertake when contemplating the admissibility of out-of-court statements proffered to the court for admission as state of mind evidence.

First, the court must ascertain the reason that the moving party is offering the evidence. If it is not being offered for the truth of the matter asserted, it is not hearsay, and can be admitted to demonstrate the non-truth purpose. In a jury trial, the evidence should be admitted in conjunction with a limiting jury instruction to ensure that the jury considers the evidence solely to demonstrate the speaker's mindset at the time of the utterance, and not for the truth of the words spoken. For instance, if a declarant says "I had butterflies in my stomach," when offered for the non-truth purpose, the jury can consider the statement as evidence that the declarant was anxious, but not that she actually had flying insects in her stomach.

If the statement is offered as substantive evidence for the truth of the matter asserted, the court must examine the statement more closely and make a number of preliminary rulings. First, like all evidence, the statement must be relevant. In the context of state of mind evidence, the speaker's mindset must be pertinent to some contested issue in the legal proceeding. In criminal cases, the prosecution must prove the defendant's *mens rea* beyond a reasonable doubt. Thus, in the typical prosecution, a

victim's state of mind simply is not relevant. *See Thornton*, *supra*. There are exceptions to this general rule, including cases where the defendant has alleged self-defense, or where the defendant has challenged the manner of death, as here. Prototypically, the latter exception occurs when the defendant argues that the victim died by accident or by suicide.

Some of the cases that we characterized as "broad" in *Moore* ended the analysis here. Indeed, what was "broad" about the rulings in *Fletcher* and *Stallworth* was this Court's apparent belief in those cases that relevance to some overarching issue in the case alone justified admission of the evidence. As is evident from our analysis, there is much more to consider. *Moore* rightly redirected this Court toward a more exacting analysis.

If the statement is relevant, then the court must examine the character of the statement being proffered. If the statement is a singular expression of the declarant's state of mind, *i.e.*, "I was sad," the court need only apply Rule 803(3). So long as the expression refers to the declarant's state of mind (or physical condition), and not to a third-party's state of mind, and so long as the statement refers to the speaker's mindset as it existed at the time the statement was made, facially it is admissible. Of course, a final ruling on the admissibility of the statement is subject to the final proviso of Rule 803(3) (excluding from admissibility "a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will"), as well as the traditional probative value versus prejudicial impact rubric by which all evidence is assessed. *See* Pa.R.E. 403.

On the other hand, if the statement is not a singular purpose statement, but instead contains both a state of mind component and a "fact-bound" component, *see Moore*,

*supra*, it generally is inadmissible. The reasons rendering such statements inadmissible are patent, and compelling.

As we noted in *Moore*, such two-part statements are only relevant if they are taken for their truth. The problem is that there are two parts to these statements, only one of which facially is admissible: the state of mind component. The factual component is not. That part, which is uttered out-of-court and also offered for the truth of the matter asserted, does not satisfy this exception to the hearsay rule, nor does it possess the same hallmarks of reliability imputed to state of mind evidence. That one aspect of a statement is admissible does not render all of a multi-part statement admissible. Quite to the contrary, both components must independently be admissible. Each aspect of the statement must satisfy a hearsay exception.[7]

---

[7]    The Dissent would not adhere to the requirement that each component of a dual-purpose out-of-court statement independently must be admissible before the entirety of the statement may be entered as substantive evidence. Instead, the Dissent would hold that Annemarie's whole statement nonetheless is admissible so long as just one part of the statement is admissible and is accompanied by a limiting instruction. The most obvious problem with this perception of the admissibility of Annemarie's statement is that this is not what happened in this case, and is not the circumstance under review in this case. Annemarie's statement was admitted as substantive evidence, in its entirety, and was not accompanied by a limiting instruction. The question in this case is whether such a statement, as it actually was admitted here, was admissible. For the reasons outlined in this opinion, it was not.

More importantly, as a general evidentiary matter, attaching a limiting instruction to an otherwise inadmissible statement does not transform that statement into an admissible one, as the Dissent envisions. There is no question that jury instructions serve indispensable functions at a trial. Instructions can explain, constrain, or clarify evidence. They are used to mitigate potential confusion, constrain the use of evidence by the jury, or limit the prejudicial impact of certain types of evidence. That instructions are useful, however, does not mean that the mere provision of an instruction suffices to render inadmissible evidence admissible. To the contrary, the question of whether to provide an instruction arises only after the contested evidence preliminarily has been ruled to be admissible. Instructions assist juries by informing the jury members what to do with the already deemed admissible evidence; they are not mechanisms that convert inadmissible

In *Moore*, we explained the problem with admitting a statement into evidence where only a part of it is admissible. Doing so allows the proponent of the evidence to bootstrap inadmissible hearsay into competent evidence. This permits a party to use the state of mind exception as a mechanism to circumvent the rules of evidence, repurposing state of mind evidence into a "conduit" to obtain admission of otherwise inadmissible facts. *Moore*, 937 A.2d at 1072-73.

In addition to enabling a party to prove facts that it otherwise could not, such evidence poses a considerable "risk of severely prejudicing the defendant." *Stallworth*, 781 A.2d at 128 (Saylor, J., concurring and dissenting). Even when the statement is offered to establish the victim's state of mind and is accompanied by a limiting instruction, such statements can directly or "inferentially implicate[] the defendant," *id.*, and likely will improperly divert the jury's attention. Additionally, "[t]he possibility of over-persuasion,

statements into admissible ones. No rule of evidence allows for such bootstrapping. There is no legal support for the Dissent's proposed method of assessing admissibility.

Pa.R.E. 105 similarly proves unavailing for the Dissent. Rule 105 states that "[i]f the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly. The court may also do so on its own initiative." *Id.* The Dissent suggests that, pursuant to this rule, the trial court could have followed the Dissent's proposed course of action and admitted the evidence for the state of mind purpose, so long as the court issued a contemporaneous instruction. *See* D.O. at 2-3. However, the rule makes clear that, before a trial court can limit the evidence through the issuance of an instruction, the evidence in question first must be "admissible." Pa.R.E. 105. The rule does not speak to partial, limited, or conditional admissibility. Thus, before a court can limit evidence to a particular party or purpose, the court must find that the proffered evidence is admissible in its entirety, and then contemplate whether and how to limit it. Here, the statement at issue is a dual-purpose statement, one that has two components, only one of which was admissible. Because the Dissent's admissibility-by-instruction concept finds no support in the rules of evidence (and because there was no such instruction given), Rule 105 is applicable to the present circumstances only upon satisfaction of the rule's prerequisite: that Annemarie's statement was admissible in the first instance, and as presented at trial. As it was not, any reliance upon Rule 105 is misplaced.

the prejudicial character of the evidence, and the relative weakness and speculative nature of the inference," all militate against the admitting the evidence. 2 McCormick on Evidence § 276 (8th ed.)

In *Brown*, the United States Court of Appeals for the D.C. Circuit explained the dangers of admitting this type of evidence, as follows:

> While such statements are admittedly of some value in presenting to the jury a complete picture of all the facts and circumstances surrounding the homicide, . . . [such statements] are fraught with inherent dangers and require the imposition of rigid limitations. The principal danger is that the jury will consider the victim's statement of fear as somehow reflecting on defendant's state of mind rather than the victim's—*i.e.*, as a true indication of defendant's intentions, actions, or culpability. Such inferences are highly improper and where there is a strong likelihood that they will be drawn by the jury the danger of injurious prejudice is particularly evident.

*Brown*, 490 F.2d at 765 (footnotes and citations omitted). The court further explained:

> The quantum of prejudice . . . is highest when the circumstantial facts in the statement are intimately related to the issue to be proved. In the context of homicide cases . . ., it is clear that where the improper purpose for which the jury might consider the evidence bears closely on the central question of the defendant's guilt or innocence there is less likelihood that the jury will confine the statement to its proper realm. Here the functional utility of the limiting instruction becomes doubtful."

*Id.* at 766. "The more narration of past acts or conduct of the defendant contained in the statement, the greater the danger of jury misuse." *Id.* at 775.

Finally, this conclusion is consistent with the text of the exception. Rule 803(3) permits only statements establishing the declarant's state of mind, but no one else's. Nevertheless, it also forbids the admission of "a statement of memory or belief to prove the fact remembered or believed" unless it relates to a will. Pa.R.E. 803(3).[8] Thus, the

---

[8] The Dissent makes no attempt to align this limiting aspect of Rule 803(3) with its belief that the contested evidence was admissible, nor does the Dissent attempt to resolve its broad view of admissibility of Annemarie's statement with the fact that the state-of-mind exception is predicated upon the reliability of an expression of the

exception provides for very limited uses of state of mind evidence. Proving substantively a fact contained in a statement, *i.e.*, something other than the declarant's state of mind, is not one of those uses.

With this analytical framework in place, we turn now to Annemarie's note. As previously observed, the content of the note undeniably was relevant in this case. Fitzpatrick contended at trial (and still does) that Annemarie was not murdered, but instead died from an ATV accident. Annemarie's note was directly relevant to countering this assertion. *See Brown*, *supra*.

Having established that the note was relevant, we next assess the purpose for which the Commonwealth offered the evidence. The Commonwealth conceded before trial that the note was hearsay, but argued that it nonetheless was admissible for the truth of the matter asserted under Rule 803(3). *See* N.T., 10/20/2014, at 96 (arguing that the note was "admissible hearsay, and the reason is because it goes to the state of mind exception to the [h]earsay rule"). Judge Snyder agreed, ruling that the note could be admitted at trial as substantive evidence. The Commonwealth did just that. And then, during opening statements and closing arguments, the Commonwealth repeatedly emphasized the truth of the note to the jury. There is no question that the note was offered into evidence—and repeatedly highlighted by the prosecutor—to establish the truth of the matters asserted therein. This, too, is not disputable.

The note fairly can be construed both as an expression of Annemarie's then-existing impression of the state of her relationship with Fitzpatrick and as an expression of her fear of him. Had the statement simply reflected that mindset, it would be admissible under Rule 803(3). However, the statement identifies Fitzpatrick as her assailant and

---

declarant's state of mind, not upon a declarant's belief about another person's state of mind.

tangentially implicates his state of mind. This portion of the note is not admissible as state of mind evidence, but instead is an inadmissible factual averment. Simply put, it is hearsay. Neither the implication of Fitzpatrick's *mens rea* nor Annemarie's identification of him as her possible assailant constitutes a statement of Annemarie's then-existing state of mind, which is all that is permitted by Rule 803(3). Moreover, the assertion fails to satisfy any other hearsay exception.

For all the reasons outlined above, the fact-bound aspect of Annemarie's note cannot be bootstrapped into admissibility merely because the statement contemporaneously contains some expression of Annemarie's state of mind.[9] If we held otherwise in this case, the resultant prejudice and potential for misuse by the jury would

---

[9] The Dissent would take a different approach to reviewing the proffered evidence. Instead of deciding whether each component of compound statements preliminarily is admissible, the Dissent would assess "the probative value, potential prejudice, and effectiveness of a limiting instruction." D.O. at 4. The Dissent argues that, by failing to do so, we have eschewed a case-by-case analysis for an inflexible *per se* rule out of concern for the prejudicial impact of this type of evidence. Respectfully, the Dissent's criticism is mistaken, and its proposed analysis creates unnecessary complexities. Our ruling is that Annemarie's statement was inadmissible because only one component of her dual purpose statement was admissible, instead of both. We have not created a *per se* rule that such statements are never admissible. Rather, we hold only that this statement is inadmissible because the fact-bound portion of the statement was not admissible under Rule 803(3) and also "fails to satisfy any other hearsay exception." M.O. at 42. Like all evidence, including double hearsay statements, every proffered statement must be considered independently both by its components and as a whole. We hold that, to admit the evidence here allowed the jury to hear and consider improper, inadmissible out-of-court statements. We do not address any other statements or circumstances.

Additionally, despite the Dissent's contrary belief, neither probative value, nor prejudicial impact, nor the effectiveness of a limiting instruction can alter the incontrovertible fact that the statement contains two components, only one of which was admissible. Considering all of the proposed elements of the Dissent's analysis would require consideration of complex issues that ultimately will have no bearing on the ultimate issue of admissibility. Annemarie's statement was inadmissible even had the statement had the highest probative value and the lowest prejudicial effect, or was accompanied by the most helpful instruction. None of these considerations permit overlooking the applicability of the rules of evidence, in particular the hearsay rules, which unequivocally preclude admission of Annemarie's statement in this case.

be apparent. As Justice Cardozo remarked, "[w]hen the risk of confusion is so great as to upset the balance of advantage, the evidence goes out." *Shepard*, 290 U.S. at 104. Judge Snyder's ruling to the contrary was erroneous, and was manifestly unreasonable because the ruling deviated substantively and significantly from this Court's decision in *Moore*. *See Commonwealth v. Hoover*, 107 A.3d 723, 729 (Pa. 2014) (defining an abuse of discretion as the "result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous") (citations and quotation marks omitted). Thus, the ruling also was an abuse of the court's discretion.

Having found that Annemarie's note was inadmissible, we will proceed to determine whether its erroneous admission nonetheless was harmless. *See Commonwealth v. Chmiel*, 889 A.2d 501, 521 (Pa. 2005) ("[A]n erroneous ruling by a trial court on an evidentiary issue does not require us to grant relief where the error was harmless.") (citation omitted). Our legal standards governing harmless error are well-settled. An error warrants relief "only if the appellate court is convinced beyond a reasonable doubt that the error is harmless." *Commonwealth v. Story*, 383 A.2d 155, 162 (Pa. 1978). "[A]n error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a reasonable possibility that an error might have contributed to the conviction, the error is not harmless." *Id.* at 164 (citation and internal quotation marks omitted). The Commonwealth bears the burden of proving that the error was harmless beyond a reasonable doubt. *Id.* at 162 n.11.

> Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Chmiel*, 889 A.2d at 521 (quoting *Commonwealth v. Robinson*, 721 A.2d 344, 350 (Pa. 1998)).

We can readily dispose of the first and second categories of harmless error. The reason that the type of evidence erroneously admitted here is inadmissible, as explained by the *Brown* Court and by Professor McCormick, is the enormous potential for prejudice and misuse attendant to such evidence. A factual assertion or an implication of someone else's state of mind do not possess the hallmarks of reliability that attach to typical state of mind evidence. Thus, once admitted, the jury gets to consider an unchallenged statement of questionable reliability as substantive evidence. The prejudice resulting from its admission is obvious. That necessarily was the case in the instant matter. As well, the recurring emphasis placed upon Annemarie's note by the prosecutor compels the conclusion that the prejudice was not *de minimis*. The note permeated the entire trial. The Commonwealth has not proven the contrary beyond a reasonable doubt.

Nor was the note cumulative of any other untainted evidence. There was ample evidence that Fitzpatrick had a possible motive to kill Annemarie. But, motive was not the central issue at trial. How Annemarie died was the principal question. And the note purported to answer that question for the jury. The only other evidence directly relevant to the manner of Annemarie's death was her email. However, that evidence similarly was inadmissible, as the Superior Court concluded; it hardly could be called "untainted." No other evidence of its kind was introduced by the Commonwealth. Thus, the admission of the note was not merely cumulative or duplicative of other properly admitted evidence.

The sole remaining task is to ascertain whether the balance of the uncontradicted evidence was overwhelming such that the erroneous admission of Annemarie's note "could not have contributed to the verdict." *Story*, 383 A.2d at 162 n.11. This is where the Superior Court significantly faltered in evaluating whether the admission of

Annemarie's email was harmless. That court piggybacked off a prior panel's sufficiency of the evidence analysis and concluded that admitting the email was harmless. As noted above, that is not the correct inquiry. A sufficiency analysis resolves all evidentiary conflicts in favor of the Commonwealth as verdict winner. In a harmlessness analysis, however, those same conflicts result in the evidence being excluded entirely from an appellate court's consideration. It is only the uncontradicted evidence that is included in this type of review.

As we have emphasized repeatedly, the main issue in this case was whether Annemarie died accidentally or whether she was murdered by Fitzpatrick. No one disputes that Fitzpatrick was the only person with Annemarie when she died, or that she died by drowning. But the evidence pertaining to the *manner* in which she died was contested, and contradicted, at trial in a number of ways, including in Fitzpatrick's own testimony. *See, e.g., Commonwealth v. Young*, 748 A.2d 166, 194 & n.16 (Pa. 1999) (holding that, where the defendant testified and contradicted much of the Commonwealth's evidence, none of the proofs thus disputed could be used to establish harmless error under the overwhelming-evidence approach, as it is not within the province of a reviewing court to determine the comparative credibility of conflicting evidence).

Most notably, Dr. Bollinger, the forensic pathologist who performed the autopsy on Annemarie's body, could not opine with a reasonable degree of certainty on the manner of death. Dr. Bollinger repeatedly testified that the significant blunt force trauma suffered by Annemarie could have been caused by Fitzpatrick holding her under the water or by the impact of an ATV accident. Under questioning from defense counsel, Dr. Bollinger admitted that it was equally possible that either of these scenarios caused the injuries. She went as far as to hypothesize that Annemarie's injuries also could have resulted from

the efforts to resuscitate her at the scene, or even from the embalming process. No one at trial definitively could explain precisely how Annemarie died.

Because Dr. Bollinger's testimony was disputed and inconclusive, the Commonwealth was forced to attempt to prove the manner of death with circumstantial evidence. That evidence was not so overwhelming as to negate the prejudicial impact of the note. Significantly, Corporal Thierwechter's accident reconstruction opinion testimony did not prove Annemarie's manner of death. As Judge Renn noted, at best, Corporal Theirwechter's expert opinion served to disprove Fitzpatrick's versions of events, as provided in his pre-trial statements to PSP investigators and in his trial testimony. Disproof of one theory is not the equivalent of affirmative proof of another.

All that remains is evidence proving that Fitzpatrick potentially had a motive to kill Annemarie. This body of proof includes, *inter alia*, Fitzpatrick's extramarital affair, his status as the beneficiary of Annemarie's life insurance policy, his misstatements to the police and efforts to conceal Annemarie's cell phone from them, and his inculpatory internet searches. Although this is relevant circumstantial evidence, we agree with Judge Renn that, without more, it does not amount to overwhelming evidence of guilt. While the motive evidence certainly bears tangentially upon the question of whether Annemarie was murdered, we cannot say that the motive evidence, even in conjunction with Corporal Thierwechter's testimony, was so overwhelming that we are convinced beyond a reasonable doubt that the jury would have convicted Fitzpatrick without the note.

This is particularly true when we recall the significant prejudice injected into a trial by evidence such as Annemarie's note and the heavy emphasis placed upon it by the prosecutor. Given the significance of the parties' dispute over the manner of Annemarie's death, the Commonwealth has failed to prove beyond a reasonable doubt that her note— the most important piece of the prosecution's evidence relevant to that critical question—

had no impact upon the jury's verdict. The remaining evidence simply was not so overwhelming so as to overcome the note's enormous impact. Accordingly, the admission of the note cannot be deemed harmless.[10]

For these reasons, Fitzpatrick is entitled to new trial. In light of our disposition, we need not address Fitzpatrick's second issue in any further detail. The judgment of sentence is vacated. The case is remanded to the Superior Court for further proceedings consistent with our ruling.

Chief Justice Baer and Justices Saylor, Todd and Donohue join the opinion.

Justice Mundy files a dissenting opinion in which Justice Dougherty joins.

---

[10] The Dissent would find that the error in this case that ultimately should be subject to a harmless error analysis is the trial court's alleged failure to provide a limiting instruction to the jury. Reviewing the case under that perception, the Dissent finds that no harm befell Fitzpatrick by the introduction of the statement, asserting that the portion of the statement that the jury heard that would have been mitigated or limited by an instruction merely went to identification, which was not a particularly contentious issue in the case. However, not only is the Dissent evaluating the incorrect error in the case, it significantly undervalues the impact that both components of the statement had on the only contested issue at trial: how Annemarie died. The statement not only was a statement of Annemarie's fear, but also a simultaneous expression that Fitzpatrick might commit a violent act against her. The identification of Fitzpatrick as the likely perpetrator of a potential future violent act cannot reasonably be isolated in the manner proposed by the Dissent. The identification goes hand-in-hand with Annemarie's fearful state of mind, which, when presented together, provided support for the Commonwealth's theory of the case.

The support for this conclusion is the repeated emphasis that the Commonwealth placed upon both aspects of the statement before the jury. Notably, the Dissent attempts to downplay this fact significantly. *See* D.O. at 6 n.3. The Commonwealth intermingled the components of the statement in its effort to convince the jury that Annemarie was murdered. The evidence cannot now be treated as if it were presented separately and independently, and as if each aspect of the statement was admitted to prove distinct aspects of the case. The admission of the statement, particularly when so much of the case was contradicted by the defense, cannot be said to have had no impact upon the jury's decision on the ultimate issue in the case, at least not beyond a reasonable doubt.